———o———

STATE OF MISSOURI, *ex rel.* Circuit Attorney, Respondent, *vs.* COUNTY COURT SALINE COUNTY, *et al.*, Appellant.

PER CURIAM.

1. *Injunction—Public corporation—Power of the State to restrain from the commission of unlawful acts.*—It is competent for the State, at common law through its officers, to maintain proceedings by injunction to restrain public corporations from doing acts in violation of the constitution and laws of the State. Section 24 of the statutes concerning Injunctions, (W. S., 1032,) which provides that "the remedy by injunction or prohibition shall exist in all cases where injury to real or personal property is threatened, and to prevent the doing of any

The State v. Saline County Court.

legal wrong whatever, whenever, in the opinion of the court, an adequate remedy cannot be enforced by an action for damages," also applies to such cases.

2. *Railroads—Louisiana and Missouri River Railroad—Charter—Amendments—Construction—Constitution.*—The charter of the Louisiana and Missouri River Railroad Company, which was granted in 1859, authorized it to construct a railroad by a certain designated, route "to the Missouri River at the most eligible point," and provided that it should "be lawful for the County Court of any county in which any part of the route of said railroad may be," to subscribe to the stock of said company. The new constitution, which went into effect in July 1865, provided that "the General Assembly shall not authorize any county, city or town to become a stockholder in, or to loan its credit to any company, association or corporation, unless two-thirds of the qualified voters of such county, city or town at a regular or special election assent thereto." In 1868 the General Assembly passed an act, claimed to have the effect of amending the original charter, and authorizing the extension of the road to a point beyond the Missouri River, through counties south of the river not on the route of the road, as originally chartered. *Held,* that even if the act of 1868 was valid, and authorized such extension, yet, as the counties through which the extended part of the route lay were not on the route as designated in the original charter, they were bound by the provision quoted of the constitution, and were not authorized by the provisions of the charter to subscribe to the road, without submitting the question to a vote of the people. Such a construction would give to them powers prohibited by the constitution, which they did not possess at the time of its adoption.

## PER SHEPLEY, Special Judge.

1. *Acts of General Assembly—Title,—No part of act—Must express all subjects of act—Parts of act not expressed in title, void—Special Legislation.*—An act of the General Assembly was entitled "an act to amend an act entitled an act to incorporate the Louisiana and Missouri River Railroad Company, by increasing the amount of the capital stock of said company, defining more explicitly the power of the Board of Directors to fix the Western teminus of the road, authorizing the location and construction of a branch road, and conferring upon said Board, the necessary powers to carry into effect the several objects contemplated by this charter; and also by striking out sections 11, 18, 27, 30 and 31 of said act." The act itself did not speak of the repeal of the original act, or any part of it, or any modification or amendment of it, nor did it mention the original act at all. *Held,* that said act could not create a new corporation under the prohibition in the constitution against special legislation; that the title is no part of the act, and that the language of its title alone could not operate as a repeal or amendment of the original act; and that such parts of the acts as are not expressed in the title are void.

## PER WAGNER, Judge, Dissenting.

1. *Injunction—Public corporations—Power of State through its officers to interfere.*—Where the State in its corporate character and capacity, has no interest in the litigation, its interference to prevent the commission of an unlawful act by a public corporation, can only be permitted on the ground that the Attor-

The State v. Saline County Court.

ney General or Circuit Attorney is legally authorized to interfere in all cases where private persons are held incompetent to sue, and where the rights of the whole people or any considerable number of them are in danger from the unlawful acts of persons acting or assuming to act under color of lawful authority or otherwise. Such interference under any other circumstances is not authorized by our statutes, which define the duties of the Attorney General and Circuit Attorney, nor is it warranted by Common Law.

2. *Acts of General Assembly—Titles of acts—Subject expressed in title—Constitution.*—Under the provisions of the constitution of this State, that no law enacted by the General Assembly shall relate to more than one subject, and that subject should be expressed in its title; but if any subject embraced in an act be not expressed in the title, such act shall be void only as to so much thereof as is not so expressed ; (Const. Mo., Act. IV, § 32,) an act without a title would manifestly be a nullity, and therefore it follows, that the title forms and constitutes a part of the act, and if the title of an original act be sufficient to embrace the provisions contained in an amendatory act, it will be good, and it need not be inquired whether the title of the amendatory act would of itself be sufficient.

*Appeal from Saline Circuit Court.*

*Sharp & Broadhead,* for Appellants.

I. The Circuit Attorney has no authority to proceed in the name of the State in this case. (State vs. Parkville and Grand River R. R. Co., 32 Mo., 496; Atty. Gen. vs. Utica Ins. Co., 2 Johns. Ch., 371; see also, People vs. Miner, 2 Lansing, 396.)

In this last case, the doctrine is fully reviewed, the cases of Davis & Palmer vs. The Mayor, &c., 2 Duer., 663, and of Doolittle vs. The Supervisors, 18 N. Y., 162, referred to by the counsel for the Respondent, are referred to, and the Court holds that in such a case as the one before the Court the State is not a proper party.

II. The subscription made by the County Court of Saline County is valid and legal, and the issuing of the bonds and levying the tax were acts done in pursuance of law.

At the time this subscription of stock was made by the County Court of Saline County, the Railroad Co. was organized with authority to build a Railroad from Louisiana to the Missouri River at the most eligible point.

Even though under the original charter, the route of the road could not be through the County of Saline, it was clear-

ly within the power of the Legislature, to amend the charter, and extend the route of the road through the County of Saline. It was not a dead charter. The law was still in force which created the corporation. It had not expired by limitation, which was ten years from its date, (§ 26, p. 406, Sess. Acts 1858-9.) The power of amendment, not being prohibited by the Constitution, was just as broad after as before its adoption.

This charter was amended by the act of March 24th, 1868, by which the company was authorized to extend the route of the road through the County of Saline. This court has decided such legislation to be valid and constitutional. (State ex. rel. Cir. Atty., vs. Cape Girardeau and State line R. R. Co., 48 Mo. 468.) The original charter was applicable to all Counties through which the route of the road should run. Section 3, of Art. XI. of the State Constitution declares that "all laws of the State now in force, not inconsistent with this constitution, shall continue in force until they shall expire by their own limitation, or be amended or repealed by the General Assembly."

The provisions of this charter were not inconsistent with the constitution, because its prohibitions in this respect, referred to future legislation, (State ex. rel., The Missouri and Mississippi R. R. Co. vs. Macon County Court, 41 Mo., 453.) The clause of the Constitution just quoted, has the effect of taking the provisions of the charter, authorizing County subscriptions to the stock of the Rail Road Company out of the operation of the 14th section of the same article of the Constitution, declaring that, "The General Assembly shall not authorize any city, county or town to become a stockholder in, or loan its credit to any company, association or corporation except by a vote of two-thirds of the qualified voters." This was not intended to have any controlling application to laws in existence when the Constitution was adopted. (Macon Co., case 41 Mo. 453.)

The General Assembly by the act of March 25th, 1868, passed no new law on the subject of County subscriptions; it

23—VOL. LI.

merely extended the route of the road by an amendment to the charter—and that portion of the charter referring to County subscriptions attaches and applies to Saline County; it belongs to the charter and accompanies it wherever it may take the route of the road. The framers of the Constitution did not think proper to repeal existing laws in regard to the subscription of stock to Railroad corporations, although future legislation of the same kind was prohibited, and so they did not see proper to prohibit amendments to existing charters, and this power of amendment becomes as much a part of the Constitution, as if it had been inserted in so many direct words. (The People vs. Marshall, *et al.*, 1 Gilm. 672.)

Now this authority to subscribe under the charter of 1859, did not apply to any particular County, it was ambulatory, and could only apply when and after the company had located its road, so that really it was a part of the charter, *in fact* as well as in form.

The amendment, to be invalid, must not only be against the spirit, but against the letter, or within the positive prohibitions of the Constitution. (48 Mo., 468; Commonwealth vs. the Councils of Pittsburg, 41 Penn. St., 280.)

III. But the original charter authorized the company to make its road through the County of Saline.

The language of the charter is, "thence *to the Missouri* River, at the most eligible point, &c." The Missouri river was undoubtedly to be the Western terminus of the road, but no point was designated. The road was *actually located through the County of Saline*, at the time the subscription was made.

The western terminus was at the most eligible point on the Missouri river, for that is a fair interpretation of the language —it does not say on the north bank of the Missouri river, but the Missouri river at the most eligible point. (Moses vs. Pittsburg & Ft. Wayne R. R., 21 Ills., 522.)

"To the Missouri river" does not necessarily mean on the north bank of the Missouri river, especially when we see by the charter, that it was contemplated in the charter, that the road might cross the Missouri river. (Sess. Acts of 1859.

406 § 25.)     The court will take notice that there is no other navigable stream which the road could cross on its route to the Missouri, from Louisiana on the Mississippi.

*Thomas J. C. Flagg*, for Appellant.

I. The state has no interest, equitable or otherwise, in the subject matter of this controversy. (Sayre vs. Tompkins, 23 Mo.. 443 ; State vs. Parksville and Grand River R. R. Co., *et al.*, 33 Mo., 496 ; Hopkins vs. Lovell,47 Mo., 102.)

II. There is nothing in the act of March 10th, 1859, creating this corporation, that limited the western terminus of the road to the north bank of the Missouri river.

Under the 35th section of that act, (Sess. Acts 1858-9, 407) the Railroad Company could have marked out, located and constructed their road to the south bank of said stream, or could have extended it to any point on the said river, and on either bank within the State of Missouri.   The object of the act was not to fix the western terminus of the road at any definite point on the Missouri River.   If it could have been located and constructed to a point on the south bank of the said river, and within the limits of Saline County, then the 29th section of the act of March 10th, 1859, would certainly have authorized the County Court of that County, to have made the subscription, because then, a " part of the route of said railroad, " would have been, in the language of the act, within Saline County.   But if the construction of the act 1859, contended for by Respondents, shall prevail, then it is submitted, that as the Company has authority by the 25th section of that act, to build their said road "over any stream or highway " in the State, with the simple condition that if it is located and built over a navigable stream, it shall be so done as not to obstruct the navigation of the same, it might still have crossed the Missouri river, and re-crossed it for the purpose of reaching any point selected by the Company for its western terminus.   The point to be selected for this purpose, in the language of this act, is simply to be at " the most eligible point," on the Missouri river.

There is no prohibition against the crossing of that stream, and nothing in the act which justifies the construction given to it by the Respondents.

The record shows, that the road was, in point of fact, located from Louisiana to Kansas City previous to the making of the subscription, and it is so averred in the answer of appellants, and that Saline County was on the line of the road so located.

III. But if it shall be held that the subscription was not authorized by the act of 1859, it was clearly authorized by the amendment of the charter of said company, approved March 24th, 1868, (Sess. Acts 1868, p. 97, *et seq.*)

It is insisted that this amendment is clearly within the scope and meaning of the Constitution, and not repugnant to any of its provisions. The 3rd section of Art. XI, of the State constitution, provides that, " all statute laws of this State, now in force, not inconsistent with this constitution, shall continue in force, until they shall expire by their own limitation, *or be amended*, or repealed by the General Assembly. "

There is no question, but that the language is broad enough to embrace the act of 1859. No exceptions whatsoever are made. The act of incorporation of the Louisiana and Missouri river Railroad company is not inconsistent with the provisions of the state constitution. (State *ex. rel.* Mo. & Miss. R. R. Co. vs. Macon Co. Ct., 41 Mo., 453 ; Cass vs. Dillon, 2 Ohio St., 607.)

IV. The act approved March 24th, 1868, amendatory of the act of March 10th, 1859, is in all respects in accordance with the provisions of the 25th and 32nd sections of Art. IV, of the Constitution of this state, (Const. of Mo., 48, 49.).

The title under these provisions becomes one of the most important parts of the whole act. In this case it sets out, with great clearness and distinctness the general scope and objects of the whole bill. There was no room for deception. It purports upon its face, to be an amendment of the act of 1859, and states in what particulars that act is intended to be amended. There is no inhibition against the revival or re-

enactment of a law, but simply against the manner of doing it.

It is clear then, that whether this case is to stand upon the act of 1859 or the act of 1868, in either case the subscription of the stock in question by the County Court of Saline County was authorized, and therefore legal and valid. This court held, in the case against the Macon County Court, above referred to, that an authority given by Legislative enactment to a County Court to make such a subscription of stock was not taken away by the adoption of the provision in the constitution, by which thereafter such subscription could be authorized, only by a vote of the people. No vote was necessary here under either act.

The power to amend, if properly exercised, carried with all of the powers, privileges and franchises that belonged to the original charter. The act retaining, in the amended act of 1868, the authority of counties, on the route of the road, to become stockholders in the company, is not to be treated then, as a new power vested by the Legislature by simply enabling the corporation to carry with it, to the full extent of the line of its road as necessary incidents, whatever properly belonged to its original charter. The Cape Girardeau and State line case, and the Macon County case, taken together, as they must be, clearly make the subscription of Saline County valid and legal.

*Warner, Circuit Attorney, with whom was W. B. Napton,* for Respondent.

I. The subscription of Feb. 7, 1868, by the County Court of Saline County was without authority of law and therefore null —for,

1. The Act of March 10, 1859, under which it purported to be made, did not authorize it. A road from Louisiana in Pike County to the Missouri River will certainly not run through Saline County, which is on the south side of the river.

2. Though this subscription was made under the Act of 1859, above referred to, yet as that act clearly did not authorize it, an effort is made to bring the subscription under the shelter

of an act passed on the 24th March, 1868, nearly two months after the subscription was made. .

Upon this point my positions are,

*a.* If the subscription was not authorized, when made, under the act of 1859, it could not be subsequently ratified under the act of 1868, made after the new constitution, when the Legislature was deprived of authority to allow such subscriptions, except after a vote of the people.

*b.* The Act of March 24, 1868, is in direct conflict with sec. 32, of art. 4, of the constitution of Missouri, adopted long before the passage of that act. The act and its title do not correspond in any single particular. Its title indicates and declares it to be an amendatory law—the act which we find under the title is not and does not purport to be amendatory of any law. The first clause of it creates a company or corporation—and the 34 additional sections refer only and altogether to that company chartered by the first section. Throughout the entire law, from section 1 to section 34 inclusive, there is not one word of reference or allusion to, much less any specific mention of, the act of 1859, or any corporation chartered by that act. See the act *passim*, but especially sections 18, 21, 26, 33, 34, &c., in all of which it is said that this legislation is concerning "the said company hereby incorporated."

Either the title of the act is a fraud, or the act itself is—as there is no connection whatever between the act and its title. Sec. 25 of art. 4, Const. of Mo., does not authorize the form of the amended act of 1868. (Cooley, Const. Lim., 151 ; Jones vs. Commissioners 21 Mich., 241.)

*c.* The 20th section of the act, under which alone the subcription could stand, if it has been made under and by virtue of this act, is, beyond doubt, so far as it applies to Saline county, in conflict with sec. 14, art. 11, of the Constitution. Admitting this act of 1868 to be a *bona fide* and constitutional amendment, the Legislature surely cannot repeal the Constitution by an amendment any more than they could by an original act. This 14th section has been construed by our Supreme Court as applicable to all legislation made after the Constitu-

tion went into effect, and as this act or amendment of 1868 was long after the new Constitution went into operation, the decision of the court in the Macon County case determines such legislation conflicting with the 14th section aforesaid to be null and void. (State *ex rel.* M. & M. R. R. vs. Macon Co., 41 Mo., 453.)

*d.* The act of March 24, 1868, is also in conflict with sec. 4, art. 8, of the Constitution of Missouri. (*Ex parte* Pritz, 9 Iowa, 30 ; Davis & Bro. vs. Woolnough, *Ib.*, 105 ; Atkinson vs. Mar. & Lou., R. R., 15 Ohio, St., 21 ; Cooley on Const. Lim. and decisions of Kansas, Michigan, Iowa, &c., there cited.)

II. An injunction in the name of the State, suing through her proper legal officer, the Circuit Attorney for the circuit including Saline county, is the proper remedy. (Davis & Palmer vs. City of New York, 2 Duer, 663, *Ib. s. c.*, 1 Duer, 479 ; Doolittle vs. Supervisors of Broome Co., 18 N. Y., 155 ; Roosevelt vs. Draper & others, 318 ; 16 How. Pr., 157; See British authorities cited in '2 Duer, 665 ; 50 Pa. St., 11 ; 54 Pa. St., 401 ; 34 Ills., 293.)

1. The County of Saline is a municipal corporation, capable of suing and being sued. The executive, legislative and administrative authorities of this municipal corporation are, under our laws, the County Court—a body which also is invested with and exercises some judicial functions. In this railroad subscription, however, as the Supreme Court has already determined in the application for a certiorari in this case, the County Court exercised merely administratve functions, and was not acting as a judicial body—and upon this ground alone the Certiorari was refused. And so too our Court has decided that a Prohibition lies only in judicial cases, or cases wherein judicial functions are exercised. (Vitt vs. Owens, 42 Mo., 512.) No appeal or writ of error lies, as is conceded on all hands, and the only remedies remaining, known to the law, are mandamus and injunction—the one being the counterpart of the other ; the former being used to compel some administrative act, the latter to prevent it. The former, mandamus, was in the power of the railroad company, if they had desired to

enforce the issue of these bonds ; and our Supreme Court has on proper applications not only compelled·the issue of bonds, but required the court to levy taxes to meet such obligations. (Flagg vs. City of Palmyra, 33 Mo., 440.) The latter is the only remedy to restrain the issuance of such bonds, where the subscription is unlawful and unconstitutional. (W. S., 1032.)

2. It is a mere mockery of redress to compel each tax-payer in the county to let his property go for the tax and drive him to his action of trespass. But whether this be so or not, it is clear that the tax-payer cannot resort to his Injunction, but the State, whose duty it is to see to the acts of all its municipal corporations, must interfere. The New York Courts, in the cases cited, discuss this subject thoroughly, and I leave it on their arguments. (23 N. Y., 318; 16 How. Pr., 137.) If an injunction does not lie, then the result is that there is no preventive redress, and tax-payers must wait till their property is levied on to pay the tax—an alarming and deep reproach to our judicial system, and especially to equity jurisprudence which delights in prevention rather than redress for past injuries. (W. S., 1032, § 24 ; State ex rel. Lex. & St. Louis R. R. vs. Saline county, 45 Mo., 248-9-10.)

3. The case of the State vs. Parkville & G. R. R. R. Co. (32 Mo., 497) does not conflict with the propositions assumed in this case. That was a private suit, brought by individual citizens, using the name of the State just as it is used in suits on administrator's bonds ; this application is made through her appointed attorney.

4. The authorities in New York and England, are decisive on the remedy by injunction, on the part of the State, through her legal attorney ; and there are no cases in this State on the point, and reason and public policy strongly urge in favor of this preventive remedy.

V. There is not a line, or word, or syllable in this charter of 1859, which indicates any intention to cross the Missouri River.

SHEPLEY, Special Judge, delivered the opinion of the Court

This is an action brought in the name of the State, by the

Circuit Attorney of the Sixth Judicial circuit, against the County Court of Saline county and its judges and the Collector of Saline county, to restrain the County Court and its officers from issuing bonds to the Missouri and Louisiana Railroad Company, or any county warrants, in payment of their subscriptions to the capital stock of that company, and from the levying or collecting any taxes for the purpose of paying such bonds or the coupons thereon or such warrants.

The petition sets forth, that on the 7th day of February, 1868, the County Court of Saline county undertook to subscribe four hundred thousand dollars to the capital stock of the Louisiana and Missouri River Railroad Company; that the said railroad company was incorporated in 1859, and by the terms of its charter it was provided that " it should be lawful for the County Court of any county, in which any part of the route of said railroad may be, to subscribe to the stock of said company. " That the route of the railroad, designated in that act, was a route wholly on the north side of the Missouri river, and did not run through or into the county of Saline on the south side of the river. That the County Court of Saline county, did on the 7th day of February, 1868, make its subscription, professing to act under the permission ·given by the act of 1859. That this was done without ever having submitted the matter to the voters of Saline county for their assent, and was in violation of the 14th section of the 11th article of the Constitution of the State. That after the subscription was made, and on the 14th of March, 1868, the Legislature passed an act purporting, by its title, to be an act amendatory of the former charter of the railroad company. That this act is void, as conflicting with the 4th section of the 8th article of the Constitution and with the 32nd section of the 4th article, and that the 20th section of the act, if valid, conferred no authority upon the County Court of Saline county to subscribe for stock. That their subscription was without any authority of law, was an usurpation of power, was at variance with the letter and spirit of the Constitution, and of the laws of the State. That the County Court have already is-

sued some bonds to pay for the subscription, and threaten to issue others. That the County Court have assessed and levied taxes for the purpose of paying the bonds and interest, and have included the tax so assessed in the general county taxes against the individual tax-payers, so that it cannot be separated, and that the whole scheme was a fraud upon the tax-payers. That if any remedy existed at all to the tax-payers, it is by a multiplicity of suits by each tax-payer for himself. That the tax-payer cannot tell what part of the tax assessed against him is illegal; praying that the County Court and its officers be restrained from issuing any more bonds or warrants for that purpose, and that the officers and collector be restrained from levying, assessing, or collecting taxes for the payment of such bonds or warrants, or the interest thereon.

The defendants answered, denying the illegality of their action in the matter of the issue of these bonds, claiming that they had full power to make the subscription, under the original charter of the railroad. That the route, as designated in that charter, was not wholly or exclusively on the north side of the Missouri river, but that the directors had the authority to locate the route from Louisiana to any point in the State of Missouri, whether on the north or south side of the river; and that before the subscription the directors had located it from Louisiana to Kansas City. That Saline county was on the route of the road thus located.

They deny that the act of the 24th March, 1868, called the amendatory act, is void or in conflict with the Constitution of the State, or the subscription illegal or the bonds void.

The case was heard upon the petition and answer without further proof, and the court made the preliminary injunction perpetual, and the defendants appealed.

The question that lies at the threshold of this case, is whether such a proceeding as this is, can be maintained by the State.

It is asserted by the plaintiff that it is competent for the State, through its authorized officers, to institute this proceeding to restrain public corporations from doing acts in violation of the Constitution and laws of the State.

On the part of the defendants, it is contended that the Attorney General or the Circuit attorneys, in their respective districts, have no authority by statute to institute such a proceeding in the name of the State. That if such power exists at all, it exists by virtue of the common law, and that by the common law such interference on the part of the State is confined to two classes of cases—one being that of public nuisances, and the other being the administration of charitable trusts.

The question is obviously one of great importance. Though, as will be seen hereafter, it has been considered and decided in the courts of other States, it has received the most elaborate examination in the courts of the State of New York, and especially in the case of Davis and Palmer vs. The Mayor of New York, *et al*, (2 Duer, 663) and in the case of the People vs. Miner, (2 Lansing, 396.)

The case in 2 Duer, 663, was brought by two tax-payers against the Mayor and others to restrain the' construction of a street railroad upon Broadway, for the doing and operating of which the municipal authorities of the city had given authority to the individual defendants under their general power over the streets of the city. The court decided that it was not a public nuisance, but that when any act of a municipal corporation is sought to be restrained or annulled as a violation of its charter, or breach of trust, or an excess of power, the Attorney General was a necessary party, either prosecuting alone or in conjunction with or upon the relation of individual corporators, and required that the Attorney General should be made a party to the proceeding. After examination, Judge Duer arrives at the conclusion that at common law the Attorney General in England could institute proceedings to restrain public and private corporations from exercising powers not granted and from the abuse of those granted ; and to sustain his position cites 2 M. and C. 129 ; 2 M. and C. 613 ; S. C., 1 Kane, 153 , 4 M. and C. 17; S. C., 2 Keene, 190; 1 M. and C. 171 ; 8 Sim., 193, 373 ; 9 Sim., 30, 36, 56 ; 13 Sim., 547 ; 16 Sim., 228 ; 2  1 Bligh N. R., 312.

In the subsequent case of the people, at the relation of the Attorney General, vs. Miner, 2 Lansing, 396, which was a suit brought to restrain the commissioners of the town of Augusta from subscribing to the capital stock of a railroad, the Supreme Court of the Fifth district held that the action could not be maintained. Judge Mullen, in delivering the opinion of the court in that case, while conceding that the decision of the court in the case in 2 Duer, 663, was correct, yet denies that the conclusions reached by Judge Duer in his opinion in that case as to the power of the Attorney General in England, are maintainable or warranted by the decisions he quotes. He undertakes to define and classify all the powers posssessed by the Attorney General in England, the only two of which, as stated by him, relating to this matter are by writ of *quo warranto* to determine the right of him who claims or usurps any office, franchise or liberty, and to vacate the charter and annul the existence of a corporation for violation of its charter, or omitting to exercise its corporate powers, and by *information to chancery* to enforce trusts and to prevent public nuisances and the abuse of trust powers.

He examines all the case cited by Judge Duer (except the case in Bligh N. Reports), and undertakes to show that they are all cases of an abuse of trust or a misapplication of trust funds, and are maintainable under the general equitable authority of the court over trusts.

But if that be conceded, how does it show that Judge Duer is mistaken? Every misapplication of public funds and every abuse of power by public bodies is in one sense an abuse of a trust. These trusts are certainly not charitable trusts, and it is not contended that the Attorney General has power to institute such proceedings over all trusts, private as well as public. How, then, had the Attorney General a right to interfere here about these so-called trusts? Not certainly because they were trusts, but because they were trusts in which the public were concerned.

The case which Judge Mullen did not examine, not being able to find it, the case of the Attorney General against the

city of Dublin, 1 Bligh N. R., 312, incorrectly quoted by Judge Duer as in 2 Bligh N. R.

It so ·happens that in that case, which was an appeal to the House of Lords, this question distinctly arose, and the objection was made that it was not maintainable on the ground that it involved no matter of trust. The Lord Chancellor and Lord Redesdale, who both gave opinions in maintaining the jurisdiction, refused to place the jurisdiction on the ground of a trust, but placed it upon the general ground that the State had the right to prevent the doing of illegal acts by public and private corporations. Lord Eldon referred to the case of the Attorney General vs. Browne, (1 Swans, 265) as showing that the jurisdiction was not there placed upon the ground of a trust.

But more recent cases in England have removed any obscurity, if any there be, as to the ground of the jurisdiction maintained there.

In case of the Attorney General vs. the Great Northern Railway Company, (1 Dru. and S. 154), was the case of a bill brought to restrain a railway company from buying and selling coal, and the jurisdiction was there upheld, and the Vice Chancellor placed the decision on the ground that though in that case any share holder might file a bill, yet that in the matter of the abuse of corporate powers, or the exercise of powers not granted the public sustained an injury, and it was competent for the Attorney General, ex-officio, or on relation to file an information to restrain it.

The case of the Attorney General vs. The Mid. Kent Railway Company (3 L. R., Ch., 100), which was an appeal in chancery, an information was brought by the Attorney General to compel the railroad company to make certain slopes of a certain gradient on the line of their road, in conformity with the requirements of its charter, and · it was objected that there was no jurisdiction. Both Lord Carnes and Sir John Holt gave opinions sustaining the jurisdiction, placing it upon the broad ground before mentioned.

In the case of Stockport District Water-works vs. Manchester (9 Jur., N. S., 266,) which arose on a contract between the

city and an aqueduct company to carry water beyond the limits which the city was authorized by law to supply, Lord Westbury said he would not hesitate to act upon the information of the Attorney General.

The jurisdiction has been asserted in the recent case of Hare vs. London and N. W. Railway Co., 2 John, and H., 111 ; Liverpool vs. Chorley Water-works Co., 2 Degex, Man. & G., 852, at 860 ; Ware vs. Regents' Canal Co., 3 Degex and Jones, 212, at 228.

In a recent case—The Attorney General vs. The Commissioners of West Hartlepool, 10 Law R. Eq., 152 (1870)— which was a case brought by the Attorney General at the relation of certain rate-payers against the commissioners to restrain them from diverting the funds of the town to the procurement of the parliamentary legislation, the jurisdiction was sustained and the relief granted.   Here was simply an abuse of corporate powers which was sought to be restrained.

In none of these decisions is there the slightest hesitation in placing the jurisdiction upon the broad ground, that the State had the right in this form of proceeding to restrain all corporations, public and private, from the abuse of powers granted, or from exercising those not granted.

The decision arrived at in 2 Duer, and the principle there maintained, has been approved by the Court of Appeals in the State of New York, in the cases of Doolittle vs. The Supervisors of Broome County, 18 New York, 162, and in Roosevelt vs. Draper, 23 New York, 324, as also by the Supreme Court of the First district in Roosevelt vs. Draper, 16 How. Pr., 100 ; by the Supreme Court of same district in case of People vs. Lowber, 7 Abb. Pr., 158, and in People vs. Mayor of New York, 10 Abb. Pr., 144 ; by the Supreme Court of the third district, in People vs. Mayor of New York, (32 Barb., 102,) and the Supreme Court of Pennsylvania, in 50 Pa. St., 100, as also by the Supreme Court of the State of Illinois, in the case of Board of Supervisors vs. Keady and others, (34 Ills., 296.)

The question was presented in Massachusetts, in the case of

The State v. Saline County Court.

the Attorney General vs. Salem. (103 Mass., 140,) and it was decided, that, if, in Massachusetts, the jurisdiction existed, no case was made for its exercise; and also that, under the limited equity jurisdiction given in Massachusetts by their statutes, it probably was not conferred upon the Attorney General to institute such a suit.

If the case of The People vs. Miner, (2 Lansing, 397) be supposed to decide that the State cannot institute such a suit as the present, then it seems to me that it cannot be sustained. But I do not so understand the decision in that case, though it is difficult to say just how far the court goes in this matter of jurisdiction.

That case was to restrain a town from subscribing to the stock of a railroad company, as being beyond the powers granted in their charter, and the court, while stating, at p. 407, that " it does not mean to be understood as denying the right of the Attorney General to apply to restrain corporations from exercising franchises not granted," decides the case against the right claimed in that particular case, upon the ground that the defendants were expressly authorized to borrow money, issue bonds, and subscribe for stock, and the only question was whether they had properly exercised the powers expressly granted.

But here there is no franchise, privilege, or power, either general or special, granted to this County Court to subscribe for any stock whatever, but if conferred at all, it is a legislative authority to subscribe to the stock of a certain railroad company, and, as is alleged, under certain limitations not complied with.

It was urged on the argument, with great force, that such a power on the part of the State was a very dangerous one; that there was no necessity for its exercise, as the persons whose rights were affected were perfectly competent to protect their rights, and the law afforded them a complete and adequate remedy.

It is conceded that a corrupt officer, in refusing to institute any proceeding when there was a clear violation of law or

constitution, or in putting it in motion when there was no valid ground for its exercise, might use his office oppressively; but this is no more than saying that any person or officer, to whom large powers are confided, may oppress. The remedy lies in seeing that honest and incorruptible men are put into public places, and especially so in those connected with the administration of justice.

But there is another consideration that is entitled certainly to as much weight as that growing out of a possible oppression, and that is the necessity that now exists of providing ample and efficient means for restraining public corporations from misusing powers granted, and usurping powers not granted.

To the argument that in this, and similar cases, the taxpayer has a complete and efficient remedy for the alleged violation of the law and the constitution, it is to be said that it is no argument against the right of the State to prevent public corporations from violating the law, that private individuals have the same right when their private interests are affected. The State has interests apart from and, it may be, antagonistic to those of the individual corporator. It may be to the interest of every individual corporator that the corporation should exercise powers not granted and even prohibited by the constitution, but it is the right and the duty of the State to see that these public corporations do not willfully violate the constitution or the law. If the redress is to be confined wholly to legislation, then it might be wholly ineffectual, especially in those States where the Legislature meets but in every two years.

It is worth while briefly to examine what remedy the taxpayer has in such a case as this, if the subscription be illegal and void, according to the decisions of this court.

It has been decided that certiorari will not lie, (State vs. Saline county, 45 Mo., 52); nor prohibition, (Vitt vs. Owens, 42 Mo., 512); nor will injunction lie at the suit of a tax-payer, to enjoin the assessment, levy or collection of a tax, however illegal or void. (23 Mo., 443; 20 Mo., 136; 21 Mo., 216; 22 Mo., 90; 46 Mo., 394; 47 Mo., 474; 48 Mo., 175; 48 Mo., 525.)

If a levy has been made for an illegal tax, if the warrant contains any part of the tax which is legal, or the property is liable to taxation in any form, the tax warrant protects the officer, and no recovery can be had. (43 Mo., 479; 47 Mo., 393, 462; 48 Mo., 282.)

The remedy as to illegal taxation seems to be confined to this: That if the tax-payer has real estate, and the collector is not able to make it out of his personal property, he can, when his real estate is about to be sold, enjoin the sale. (24 Mo., 20; 37 Mo., 228); and it seems to be held in the case of Steines vs. Franklin county, et al., 48 Mo., 176, that though the tax-payer has not the right to enjoin the assssment, levy or collection of an illegal tax, he can maintain a bill to declare the contract void, to cancel the bonds, and restrain their payment, sale and transfer.

But in such a case he must give a bond and incur a responsibility, often to the amount of tens of thousands of dollars, while he is only interested to the amount of hundreds, at most.

It is possible, too, for the corporation, conscious that they are about to do an illegal act, to take such steps that the act is done, and the bonds issued are beyond the jurisdiction of the court, so that it is very difficult, if not impossible, for the tax-payer to obtain redress.

I cannot think that there is furnished any effectual protection to the tax-payer from being compelled to pay an illegal tax, or to the State for the violation of the Constitution or the law.

But it it is further urged that the Supreme Court of the State has already decided against the jurisdiction here claimed, in the case of the State at the relation of Connelly et al., vs. the County Court of Platte county and the Parkville and Grand River Railroad Company, 32 Mo., 496. This was a proceeding brought in the name of the State, to restrain the county from issuing bonds to the railroad company as not authorized by law, brought, not by the Attorney General or the Circuit Attorney, or at their instance, but by

24—MO. STAT.

some citizens of the State, who undertook to use the name of the State without authority in their suit; and beyond question the case was rightly decided. The question arose upon a demurrer to the petition, and one of the grounds for sustaining the demurrer is thus stated : " There is nothing in the petition which shows or pretends to show that the State of Missouri has any interest, legal or equitable, in the subject matter of the controversy, and the suit was improperly brought and cannot be maintained in the name of the State," and this is all that is said on the subject in the opinion. That the State had no pecuniary interest may perhaps be conceded, but the question was not raised or considered whether the State, acting through its legal officers, cannot restrain its public corporations from violating the Constitution and the laws.

It seems to me that, both on principle and authority, this proceeding is maintainable; and that while, in the case of private corporations, the courts in this country will sustain the conclusions arrived at in 2 John. Ch., 371, in 103 Mass., 138, and 104 Mass., 239, that the writ of quo warranto affords an ample and efficient remedy for any violation of its charter, or misuse or abuse of its powers, and therefore that this form of proceeding will not lie, the power of the State, through its proper legal officers, to restrain public corporations from a violation of the law will be sustained.

In the case of the Attorney General vs. Salem, (103 Mass., 138,) the court held that the writ of quo warranto did not lie against a public corporation, and unless we are prepared to admit that the State has no other remedy for the willful and flagrant violation of laws by a public corporation, than by legislation, then the law which appears for the first time in the revision of 1865, and is efficient both for the State and the individual, gives the power to the State to use the remedy by injunction, when it provides, (2 Wag. St., p. 1032) that " the remedy by writ of injunction or prohibition shall exist in all cases where an injury to real or personal property is threatened, and to prevent the doing of any legal wrong whatever, whenever, in the opinion of the court, an adequate remedy cannot be afforded by an action for damages. "

Having arrived at the conclusion that this form of remedy is maintainable by the State, we come now to consider whether the State has made such a case as will allow its application here.

By the fourteenth section of the eleventh article of the Constitution, which took effect on the 4th day of July, 1865, it was provided, " that the General Assembly shall not authorize any county, city or town to become a stockholder in, or to loan its credit to any company, association or corporation, unless two-thirds of the qualified voters of such county, city or town, at a regular or special election, assent thereto. "

This subscription of four hundred thousand dollars by Saline county to the stock of this railroad company was made after the taking effect of the Constitution, and without any assent of the qualified voters being obtained to such subscription. Was the subscription, so made, valid?

This court, in the case of the State ex rel. the Missouri and Mississippi railroad vs. Macon county, 41 Mo., 453, where the charter of the railroad passed before the adoption of the new Constitution, gave power to counties on the line of this route to subscribe without limitation, held that the fourteenth section of the eleventh article of the Constitution, was a limitation on the *future* power of the Legislature, and was not intended to retroact so as to have any controlling application to laws in existence when the Constitution was adopted, and decided that though Macon county made its subscription to the company after the adoption of the Constitution, and without any submission to the qualified voters, the subscription was valid.

A similar provision as to the subscription without limitation, is found in the charter of the Louisiana and Missouri River Railroad Company, passed in 1859, and the first question that is presented is, whether Saline county, situated on the south side of the Missouri river, is, by the terms of the original charter of this railroad company, authorized to subscribe to the stock of that company.

The route of the railroad, as fixed by the 35th section of the

original charter, is in these words, (Session Acts 1858-9): " Said company shall have the power to mark out, locate and construct a railroad from the city of Louisiana, in the county of Pike, by way of Bowling Green, in said county, to some suitable point on the North Missouri railroad, intersecting said road between the southern limits of the town of Wellsburg, in Montgomery county, and the northern limits of the town of Mexico, in Audrian county ; thence to the Missouri river at the most eligible point, on a line the most suitable and ad-vantageous, " &c. ; and by the twenty-ninth section it is pro-vided " that it shall be lawful for the County Court of any county in which any part of the route of said railroad may be, to subscribe to the stock of said company, " &c.

It is set up in the answer, and contended here, that the words cited, authorize the railroad company to *cross* the Mis-souri river and continue its road on the south side of the river till it strikes Kansas City, on the south bank of the Missouri, and some words in the charter in relation to the bridging of navigable streams are seized on to show that, (as is asserted,) as there are no navigable streams on the north side of the river within the State, it was the intention of the Legislature that the company might cross the Missouri river and bridge navi-gable rivers on the south side.

It is sufficient to say that neither the words used nor the plain intent of the act will admit of any such construction. When a railroad is authorized to be built to a town, it stops there, and certainly no authority is thereby given to construct a road *through* the town to a point some miles away, and then returning to the designated town again. When authority is given to construct a railroad *to* a river, wherever it first strikes the river there it must stop. If Congress had authorized a rail-road to be constructed from the west line of the State of Mis-souri through Topeka to the 100th degree of west longitude, such a construction would not allow that railroad to be construc-ted across that parallel to Denver, and return to some other point on the 100th parallel.

But if the original charter did not confer power upon Sa-

line county to subscribe, it is contended that such power is found by virtue of what is claimed to be an amendment of this railroad charter, passed in 1868, extending and changing the route of the railroad ; that such an extension and change of the route is but an amendment to the original charter, which it was entirely competent for the Legislature to make since the adoption of the new Constitution prohibiting the granting of special charters, as was held by this court in the case of State, at the relation of Circuit Attorney vs. the Cape Girardeau and State Line Railroad, (48 Mo., 468.)

If it be conceded that this act of 24th March, 1868, was a perfectly valid and legal amendment to the original charter of the company, does it produce the result proposed ?

The power of the County Court of Saline county to subscribe for the stock of this company, if it exists, must be derived from the power given in the original charter—no substantive grant of power after the new Constitution took effect, being possible.

How, then, stands the case ?

The power, given by the charter, of subscription by the County Court is in these words : "It shall be lawful for the County Court of any county in which any part of the route of said railroad may be, to subscribe," &c.

The power, therefore, given to subscribe is not to the counties upon the line of any railroad that may be constructed by the *corporation thereby created*, but to the counties upon "the route of said railroad," as thereby authorized; that is, on the route of the railroad as provided for and designated in the 35th section of the original charter. The Legislature might by amendment afterwards allow an extension of that railroad, or branches to that road, but those counties on the line of the extension or branches could not be on the line of "the route of said railroad," as originally designated.

There is another objection to the power here claimed, (conceding this to be a valid amendment), which is equally fatal. If the power to subscribe, as originally granted, had been a general one and not confined to the route marked out by the

charter, yet, as at the adoption of the Constitution there had been no change of the route, the power of subscription was confined to the counties on the designated route, and they could subscribe without submission to the qualified voters after the taking effect of the new Constitution, because at the taking effect the power already existed. But because, after the adoption of the Constitution, the Legislature can amend the charter by extending the route, does that give a power of subscription on the line of the extension which they did not, at the time of the adoption of the Constitution, have? This is the effect claimed for it, and the result would be the conferring upon counties of a power prohibited after the adoption of the constitution, which they did not possess at its adoption. That this is perfectly clear, seems to me when we consider that under the construction of the original charter, given in this decision, the company at the time of the adoption of the constitution was confined to the north side of the river, and at that time no counties on the south side could subscribe, even if the permission had been given to subscribe to the railroad that might be constructed by the company. So that no right of subscription without submission existed at the adoption of the constitution, in these counties on the south side, and that power must have been acquired by the force and effect of some act passed after the adoption of the constitution, and the constitution prohibits such effect.

But these are not the only fatal objections to the legality of this subscription.

The act of the 24th of March, 1868 (Session Acts of 1868, p. 97), cannot be considered as any amendment to the original charter. With the exception of the title of that act (unless it be claimed that a few words in the last section of the act refer to the original corporation, but which may as well refer to a corporation created by that act), there is not a single word in that act that refers to or mentions, or in any manner connects it with the original charter or the company formed thereunder. The title of the act is this: "An act to amend an act entitled 'an act to incorporate the Louisiana and

Missouri River Railroad Company, by increasing the amount of the capital stock of said company, defining more explicitly the power of the board of directors to fix the western terminus of said road, authorizing the location and construction of a branch road, and conferring upon said Board the necessary powers to carry into effect the several objects contemplated by this charter; and also by striking out sections 11, 18, 27, 30, and 31, of said act." But when we come to look at the act itself, there is not a word that speaks of the repeal of the original act, or any section or part of it, or of that act being a substitution for it or any part of it, or any modification of it; nor is the original act mentioned in it. It commences in its first section as follows:

"Section 1. A company is hereby incorporated called 'The Louisiana and Missouri River Railroad Company,' the capital stock of which shall be ten millions of dollars," and continues through the whole thirty-four sections speaking of the manner of organization, the subscription to the stock, general management and franchises of the corporation created by that act, as if no other corporation by that name had ever existed; stating in the 18th section that "the company hereby incorporated shall commence the construction of the said road within ten years after the passage of this act," and in the 20th section undertaking to allow county courts of any county in which any part of the line of said road may be located to subscribe to its stock, without submission to the qualified voters.

As creating a corporation it is a nullity, the Legislature being prohibited from passing any special charter. As an amendatory act of a corporation existing at the time of the adoption of the Constitution, it must stand on the effect of the title alone. Nothing is better settled than that a title to an act is no part of the act itself. All the office it can perform is to indicate the sense in which the Legislature used certain words or expressions contained in the act which are in themselves ambiguous. Dwaris on Stat. 265, (Potter's Ed.); Sedgwick on Stat. and Cons. Law, 50.

But to say that the title of an act is to repeal another act or

parts of it and substitute that act in the stead of it, when the act itself not only does not manifest any such intention, but there is no word in it upon the subject, is to make it perform an office which no one has ever contended that it is capable of performing.

It follows as a necessary consequence that if that act is void, the Louisiana and Missouri River Railroad Company are not authorized to construct any railroad on the south side of the river, and of course no subscription to it can be valid.

Neither does the 32d section of the 4th article of the constitution, which provides that "no law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title, but if any subject embraced in an act be not expressed in the title, such act shall be void only as to so much thereof as is not so expressed" in any way change or modify the law as it then stood, that the title is no part of the act.   The evil that this section was intended to reach and cure, was the deception that was frequently practiced by means of a false title, or a title not stating the whole truth, both on the public and on the General Assembly; on the public by lulling them to sleep from opposing an unjust or impolitic law; on the General Assembly in the passage of laws by their title in profound ignorance that the law contained anything but what the title gave evidence of.   That provision of the Constitution simply says; that if by your title you have not properly pointed out to the public and the General Assembly what the act is about, in so far as you have failed in that particular, your act is void.   The provision itself makes a distinction between the *act* and its *title*.   The decisions are that a title which fairly expresses the subject of the act is sufficient. The title to the act is no more operative or has any larger effect than before, except that, in order that the act itself should be valid, the title of the act must be exact as expressing its subject matter and must not be misleading.   When the Constitution prescribes that the style of the laws of the State shall be :   "Be it enacted by the General Assembly of the State of Missouri, as follows," it does not state that what precedes that style is a law or part of a law, but that which follows it.

But in this particular case, to say that the title to this act of 1868 shall operate to do that which on looking at what follows the enacting clause does not purport to be done—to give it the effect of repealing an act, or part of it, and substituting another act, or part of an act, for it—when the act itself is not only entirely silent on the subject, but the words used are entirely inconsistent with it, as has been before shown, is a result little dreamed of by the convention.

But if the effect be granted to the title it does not help the matter; the result is the same, for if the subject embraced in the "act *is not expressed in the title*," then as to so much as is not expressed the act is void. That is precisely the case here. Without going into a long comparison of the title and the act it is sufficient to say, as to the amendment of another act, and of the four or five things in which it is said to be amended called for by the title, that there is no mention made in the act itself of any previous act; no mention made of any amendment to it; no mention made of this act being any substitution for that; no mention made of any amendment in the four or five matters mentioned in the title; no repeal of the specified sections; but when we look at the act we find that it is an act granting a charter to certain persons to construct a railroad, with a capital of $10,000,000, happening to have the same name as that of a company chartered in 1859, but in no way connecting itself with that charter or with that company.

Upon the whole case the judgment is affirmed.

Judge Wagner dissents as to the right of the State to maintain the form of proceeding, and as to holding the act of 1868 void; but concurs in the remainder of the opinion that the original charter only authorized the company to construct the road to the Missouri river, and that the act of 1868 could not invest the County Court of Saline county with power to subscribe the stock without being first authorized so to do by a vote of the people.

Separate opinion by Bliss, Judge.

The Circuit Attorney of the Sixth Judicial Circuit obtained an injunction in the name of the state against the County

Court of Saline County and other county officers, restraining them from issuing bonds to the Louisiana and Missouri River Railroad Company, in the payment of a subscription of $400,-000 to its capital stock, from assessing and collecting taxes to pay the interest on the same, &c., and mainly upon the ground that the subscription was made without having first submitted the question to a vote of the people, as required by the Constitution. The petition was demurred to, the demurrer was overruled and the injunction was made perpetual.

Before considering the main question it becomes necessary, first, to inquire whether, admitting the illegality of the subscription, an injunction should be granted, and especially in the name of the State.

We have before held (45 Mo., 52) that *certiorari* will not lie to review the administrative action of the County Court; it cannot be reviewed by writ of error, or upon appeal, and unless this proceeding is sustained, each tax payer must be driven to his action against the collector, when an assessment shall be made to satisfy the bonds.

The old chancery rule prohibited injunctions when there was an adequate remedy at law, and this rule is substantially the same under our statute. Thus, a tax collector will not be restrained from the collection of an illegal tax by the sale of personal property, unless he is insolvent, or for some other reason cannot be held as a trespasser. The question usually arises when the property is not subject to taxation, and in such case the collector is held responsible, and, doubtless, if a separate assessment were made upon taxable property, but for the payment of a void obligation, the collector's tax list showing its illegal object, he might be held responsible for seizing property to satisfy the tax, and such is the remark of the court in the State vs. Parkville and G. R. R. R. Co., 32 Mo., 496, and in Hopkins vs. Lovell, 47 Mo., 102, although the liability was not charged in those cases.

To give jurisdiction, the pleader charges, among other things, that the remedy against the collector would be unavailable, because the County Court has directed the assessment of

taxes to pay the interest to be so combined with other taxes that the tax-payer must pay the illegal tax, or refuse to pay the whole. If this proceeding were in the name of the tax-payer, the suggestion might be considered. But it is not instituted to prevent a private wrong, but is an attempt to throw the shield of the State around the whole community, to ward off a public wrong from which all would suffer, and in the view which I take of the case, it does not matter whether or not each individual tax-payer can recover back the taxes he may be forced to pay for the redemption of these bonds. And yet the claim that each one who is thus compelled to pay may prosecute the collector for enforcing the payment, suggests in one direction, the magnitude of the wrong. Imagine the public grievance, when every owner of property is compelled to pay money to a wrong doer, with the privilege by expending more, perhaps, than the amount thus taken, of recovering it back. The mere pecuniary interest of an individual tax-payer is a private interest, and he must protect himself, but that which affects all tax-payers, as such, is a public matter, and, if it proceed from illegal administration, the public are entitled to protection.

Though a multitude of suits is one of the evils to be prevented, yet this is not the ordinary case where equity interferes to prevent such multiplicity, but it is analagous to a proceeding to restrain a public nuisance, or to prevent the breach of a public trust, and may be classed with the latter although no specific trust fund is being administered.

If there were any doubts upon the question of jurisdiction in other States, where, as we shall see, it has been assumed, there can be none in Missouri. The constitution denominates County Courts inferior tribunals established for the transaction of county business, and provides that the Circuit Court shall exercise superintending control over them, (Art. 6, sections 21 and 23,) and the statute concerning Circuit Courts not only gives them appellate jurisdiction over County Courts, &c., in judicial matters, but also a superintending control over them. (Ch. 136, § 2, G. S.; p. 432, W. S.) This is not an arbitrary

or discretionary control, but must be exercised by modes known to the law. Thus, we have held that *certiorari* will not lie in this case, because the proceedings were not judicial, and for the same reason there cannot be a writ of prohibition or error, and the statute has provided no mode of appeal. Thus all the remedies seem to be cut off but injunction, and if that fails, this superintending control vanishes, and there is no way to prevent any mal-administration however oppressive in its character. Our statute gives the remedy by injunction in very broad terms and says it shall exist " to prevent the doing of any legal wrong whatever, whenever in the opinion of the court an adequate remedy cannot be afforded by an action for damages." (Ch. 167 G. S; p. 1032 W. S.) Even if damages might satisfy a private tax-payer they will not compensate for perverting the revenues and harrassing the tax-payers of a whole community.

How much more adequate the remedy that " prevents the doing of any legal wrong" than those that are merely punitive or that compel every tax-payer to prosecute. The County Court may be punished for refusing to perform a ministerial duty, and yet *mandamus* will also lie. Excess of jurisdiction in judicial proceedings may be corrected by *certiorari* or, perhaps, appeal, or the proceedings may be treated as void, and yet prohibition may be also resorted to. These are cumulative and preventive remedies, and are no more known to the law than injunctions. They are all among the means by which the Circuit Court exercises its control over county courts, and yet there is no statute that so specifically points them out as there is in regard to injunctions. The former are left as provided by the common law, the latter is extended to any legal wrong whatever under the condition named.

This view has, I think, been indicated by this court, though not expressly held, in two important cases. In Tetherow vs. Grundy County Court, 9 Mo., 118, a writ of error was denied to the proceedings of the County Court appointing commissioners to locate the seat of justice, but Judge Scott says: "It may be asked, if the County Courts act in a lawless manner in

removing county seats, is there no mode known to the law by which they can be restrained? The Circuit Courts have a superintending control over County Courts, and if they exceed their powers, or act contrary to their duty in proceedings on which writs of error will not lie, there are modes by which they can be restrained in conformity to the usages and principles of law." The reporter in his note clearly mistakes the remedy indicated, for *mandamus* will not lie to prevent a wrong, but only to enforce a duty. In the State vs. Clark County Court, 41 Mo., 44, Judge Holmes, in denying a writ of prohibition in a similar case, quotes approvingly the language of Judge Scott, and remarks that " the court did not attempt to point out what those remedies were, nor is it necessary that we should undertake to indicate them now." But in the cases then and now under consideration, if the writ of injunction is denied, I know of no way in which the restraining power of the court can be exercised, and I am constrained to say, especially under the broad scope given it by the statute, that this is a legitimate and the only adequate remedy.

In whose name, then, should the proceeding be instituted? If the grounds of jurisdiction above indicated are correct, the State certainly has a right to interfere. In the ordinary jurisdiction of chancery in restraining public nuisances, the rule is that if the nuisance affect the public generally, the proceeding should be in the name of the proper representative of the crown, or of the State, or in the name of the State itself, but if individuals suffer a specific injury, they may come into court in their own name for their personal protection. (Spencer vs. L. & B. R. Co., 8 Sim., 193; Attorney General vs. Forbes, 2 M. & C., 123; The B. M. Coal Co. vs. L. C. & N. Co., 50 Pa. St., 91; Sparhawk vs. Union Passenger R. Co., 54 Pa. St., 421; Corning vs. Lowerre, 6 Johns., ch. 439; City of Georgetown vs. Alex. Canal Co., 12 Pet., 91; Bigelow vs. Hartford Bridge Co., 14 Conn., 655.) In England, following the jurisdiction of the Court of Equity over charitable trusts, it has been determined, since the passage of the municipal corporation act, directing the appro-

priation of public property for the benefit of the town, &c., that a trust has attached to it giving the chancellor jurisdiction to prevent its improper disposition. And this proceeding is in the name of the Attorney General, as in superintending and enforcing charities. (Attorney General vs. Aspinwall, 2 M. & C., 613; Same vs. Liverpool, 1 M. & C., 171; Same vs. Dublin, 1 Bligh N. S., 312.)

The same view has been applied in the State of New York to cases similar to the one under consideration. The subject is elaborately considered in Davis, &c., vs. City of New York 2 Duer, 663, and in the Court of Appeals in Doolittle vs. Supervisors of Broome county, 18 N. Y., 155, and 10 Roosevelt vs. Draper and others, 23 N. Y., 318. Doolittle vs. Supervisors, &c., was an application to restrain the county authorities from erecting a new town (township) without legal authority, and an able opinion is given by Denio, Justice, reviewing all the authorities; and he holds that the plaintiff has no such interest in the question as to authorize him to interfere, but, as in *quo warranto*, the restraining of public nuisance, &c., the State should prosecute. In Roosevelt vs. Draper, the opinion was given by the same learned Judge; he affirms the former opinion, and applies the doctrine to the corporate and quasi-corporate action of counties, cities, villages and townships. The liability to taxation was urged as a reason why the plaintiff should be allowed to prosecute, but the court held that an act of administration likely to produce general taxation was a public and not a private concern; that his liability to injury in this way arises from belonging to a community where each man is subject to pay taxes upon all he possesses (p. 233.) This question has often been before the Supreme Judges of New York in their several districts, but I have only referred to the case in Duer. The same view has been taken by a great many other Judges, although in The People vs. Miner (2 Lansing, 396), the opposite view is taken. Judge Mullin, of the five districts, delivers the opinion, and claims that in the various opinions where the other view is taken, the remarks of the court are mere *dicta*. This is a singular criticism, under the cir-

cumstances, inasmuch as all his own remarks upon the subject are but *dicta*, for the reason that there is found to be no equity in the bill, because the defendants are not such a corporation as, according to the decisions reviewed, to be subject to an action by the State.    The Supreme Court of Illinois, also, in Supervisors, &c., vs. Keady (34 Ill., 293), express in their opinion the same view.   They sustained, however, an injunction against the county authorities at the suit of a tax-payer, because they had waived the question, although he was not the proper party.    See also Craft vs. Commissioners of Jackson county, (5 Kansas, 518; 13 Mich. 540.)

A few cases have arisen in Missouri that are appealed to as having settled the question.   Hooper vs. Ely, 46 Mo., 505, was a suit by a tax-payer, but no question was raised and no opinion was given as to who should have been the proper plaintiff, and the case is no authority upon that question.

In the State vs. Parkville & G. R. R. R. Co., 32 Mo., 496, the opinion is expressed that the State has no such interest in the case as to warrant a suit in its name.   In that case the suit was on the relation of private persons, and if all were allowed to use its name when the injury is a public one, the same evil would arise as when each citizen or tax-payer is allowed to prosecute ; hence the State was made a party without authority, and the decisions were substantially correct, though for a wrong reason.   The general subject does not seem to have been duly considered, and I feel at liberty to treat the question as still open.

I am aware that the jurisdiction of a court of equity by injunction, even to restrain a public nuisance, has been denied in Massachusetts under their statute (Hale vs. Cushman, 6 Met., 425), but it is established in England, and is generally admitted in the United States ; and the rule as to the proper party plaintiff is, I believe, universal.   I have referred to a few cases where the question is discussed, and I know of none where an individual has been allowed to prosecute unless subjected to a special injury.   In the language of Thompson, Justice, in Sparhawk vs. Union Pacific Railroad Company, " he must have

a right to the redress sought, either personally or in a legally-constituted representative capacity. He may not vindicate other people's rights by process in his own name, nor employ civil process to punish wrongs to the public; this is to be done only by public officers in the name of the public."

If the court has jurisdiction at all in restraining county courts from committing a public wrong from which no one citizen receives a special injury, the restraint should be sought in the name of the State. The principle has been established in all the analogous proceedings to which reference has been made. Private persons can represent no one but themselves, and it might be disastrous to public interests, if the County Court could be harrassed with suits by every citizen of the county, whether he has suffered or will suffer special injuries or not.

I have had in this case, more difficulty in regard to question whether injunction will lie at all. Counsel have strongly insisted that there was no warrant in law for the writ, and under the former decisions of this court, which have so often denied this timely and efficient remedy, there was plausibility in their position. But resolving in favor of the jurisdiction, I find no difficulty in concluding both from reason and from analogous cases, that, when the wrong is a public one, suit may be brought in the name of the State, by its proper representative, and under our statute that representative is the Circuit Attorney.

The main question in the case presents to my mind no difficulty whatever. The company had the right to locate and construct their road "from the city of Louisiana, etc., to the Missouri River at the most eligible point," &c. A road from one point to another point or line, necessarily terminates at the latter. To hold that it may cross the line of termination, provided it returns to it again, would render language meaningless and charter provisions a blind. When the road reached the river, that was necessarily its western terminus, and that was as far as the company had a right to go under its original charter. Consequently the county of Saline, lying west and

south of the river, could not be crossed, and could not under the charter become a stockholder.

To enable the company to pursue the route west of the river an amendment to the charter was procured in 1868, and it was under that amendment that the Saline subscription was made. The right to make the amendment is conceded, but the fatal error of the county authorities in subscribing to the stock of the company consists in the fact that the question had not been submitted to a vote of the people, as required by the Constitution which, in the meantime, had gone into effect.

It is claimed that as this is an amendment to a charter which had been granted before the adoption of this Constitutional provision, the right to subscribe continues untrammeled by such provision.

It is settled that when a right to subscribe for stock to a railroad company had been granted to a county before the adoption of the Constitution, that right is not recalled, but continues to exist without regard to its restrictions. (State vs. Macon County Court, 41 Mo., 453.) But in the present case, the County Court of Saline county, until the act of 1868, had no right to make any subscriptions of this kind. That amendment granted a power which did not before exist, and the grant is necessarily subjected to all the conditions then imposed by law. It was a new grant, and it does not matter whether it gave a right to build a new branch of an old road, or an extension of the same, or one altogether new. The restriction is upon the legislative power, and the character of the road cuts no figure.

My conclusions are, that injunction is an appropriate and proper remedy, especially under our statute, in a case of this kind ; that the State is the proper party, and that the County Court of Saline County had no authority to make the subscription and issue the bonds without having complied with the conditions imposed by the Constitution. I think, therefore, that the judgment of the Circuit Court should be affirmed.

The foregoing opinion was written upon the first hearing, at the last January term. The court being divided in opinion,

25—MO. STAT. VOL. LI.

a new hearing has been had, and we have been aided by Mr. Shepley, sitting as special judge, as provided by the Constitution, in such cases. Upon reconsidering the case, I am more than satisfied with the conclusions at which I first arrived.

Mr. Shepley has so fully and clearly considered the right of the State to become a party in a case of this kind, that I would add nothing to his remarks, but only desire to say that the right and duty of the State to oversee and restrain public corporations and *quasi* corporations from usurpation or illegal exercise of powers, may not be inconsistent with the rights of a private citizen, as a tax-payer, to sue in a proper case. It may well be, that, where such exercise of power involves as its direct and immediate consequence, a charge upon the real estate of the inhabitants, each owner may receive such personal and private injury as will authorize him as well to ask the interposition of the court. In the cases above cited, where the right of a tax-payer to sue was denied, there was no such injury. The legal action complained of, required no specific assessment of taxes, nor did it create any charge upon private property, and if increased taxation was involved at all, the liability was remote and uncertain.

That question is not concluded by the decision in this case, and should still be considered an open one.

I also desire to say that the character of the act of 1868, which I have called an amendment, as its title purports, was but slightly, if at all, discussed at the hearings, and I have not considered the question whether it was an amendment in fact or a new and void act. I therefore express no opinion upon that subject.

Dissenting opinion of WAGNER, Judge.

Whether the State has the right to maintain this proceeding, at the instance of its law officers, is a question of great importance, and upon which I have grave doubts. It is obvious, I think, that the State, and by that term I mean the State in its corporate capacity and character, has no manner of interest in the litigation. Its rights are in no wise inju-

riously affected, and its interference can only be permitted on the ground that the Attorney General or Circuit Attorney, as the representatives of the State, is legally authorized to interfere, in all cases where private persons are held incompetent to sue, and where the rights of the whole people or any considerable number of them are in danger from the unlawful acts of persons acting, or assuming to act under color of lawful authority or otherwise.

In my judgment it would be unwise as well as mischievous to permit the Attorney for the State to intermeddle with the affairs of private or public corporations, when the stockholders, or others whose interests are affected are entirely competent to protect and take care of them. It would be easy to demonstrate the injustice of the rule, which would take from individuals who are aggrieved by the illegal acts of corporations, or public officers, and confer upon the Attorney General, or other lawful officer of the State, the power to maintain actions for such injuries. The consequences which must necessarily flow from such a power, would be disastrous. The officers of corporations would soon cease to be guided by the wishes or interests of those for whom they act, but would look to the Attorney General, as the one who alone could punish, and who would, when conciliated, be both able and willing to protect them. The rights of the stockholders or the corporations would depend upon the caprice, the good or ill will of the Attorney General, and instead of maintaining their own rights, they would rely on that officer, and the State would be perpetually involved in expensive litigation in which it had no real or essential interest.

There is no authority for exercising this power under the statute, for the law, in defining the duties of Attorney General says that he shall be authorized and empowered, in the name and behalf of the State, to institute and prosecute all suits and other proceedings at law and in equity, requisite or necessary to protect the rights and interests of the State, and to enforce any and all rights, interests or claims of the State against any and all persons, bodies politic or corporate. (1 W. S., 202, § 5).

Again, it is made the duty of the Circuit Attorney to commence and prosecute all civil and criminal actions in which the State, or any county in his circuit may be concerned; defend all suits brought against the State, or any county in his circuit; prosecute forfeited recognizances and actions for the recovery of debts, fines, penalties and forfeitures accruing to the State, or any county in his circuit. (*Ibid*, § 12).

The above is the statutory grant of power defining the duties and functions of the Attorney General and Circuit Attorney, and constitutes their exclusive authority under the statute, with the exception of the provision where they are empowered to exhibit an information in the nature of a *quo warranto* against a person for usurping, intruding into, or unlawfully holding or exercising an office or franchise. (2 W. S., 1133, § 1.)

This is the first case in which the power has ever been attempted to be exercised in this State, and that furnishes a strong argument to show that the profession never regarded it as having any existence.

The question was raised in a different form in the case of the State ex rel. Connelly vs. The Parkville and Grand River Railroad Company, (32 Mo., 496), and the right of the State to be made as a party, was emphatically denied. It was there held that the State could not properly be made a party plaintiff, at the relation of a private citizen, to a bill for injunction to restrain a county court of a county from issuing its bonds, or levying a tax to pay for a subscription to the stock of a railroad company; that the State had no interest, legal or equitable, in the subject matter.

An attempt is made to distinguish that case because it was at the relation of a private party, but I cannot see that that makes any difference. The main point is that the State has no interest in the subject matter of the litigation. Moreover, several of the English cases cited as an authority to sustain this proceeding, will be found, on examination, to be cases where the Attorney General proceeded at the relation of private persons, that being one of the ordinary courses in the English courts, but which is denied in this court.

As there is no statutory provision authorizing this proceeding in behalf of, and in the name of the State, it is sought to maintain it by reference to the common law authority of which it is supposed the Attorney General is possessed. If we assume that, in addition to the powers conferred by statute, that officer also has the authority that was accustomed to be exercised in England at common law by the Attorney General, still I do not think it follows that this proceeding is sustainable.

The leading case which decides that the Attorney General or the State is a necessary or rightful party in cases of this character is Davis, *et al.*, vs. The Mayor, etc., (2 Duer., 663), where it was determined, that when the act of a municipal corporation against which relief is sought affects injuriously the whole community over which the corporate jurisdiction extends, the Attorney General is a necessary party to the prosecution of the suit. That was an adjudication made by the Superior Court of the City of New York, and the authorities relied upon are exclusively from the English Chancery courts.

But Judge Mullin, in the Supreme Court of the same State, subsequently examined the question in the case of The People vs. Miner, (2 Lansing, 396), and after a most full and elaborate review of all the cases, showed most conclusively that Judge Duer misapprehended and mistook the purport of the authorities, and that the only cases in which at common law, the Attorney General was authorized to interfere to restrain corporate action, or was a necessary party to an action for that purpose, were those in which the act complained of would produce a public nuisance or tend to the breach of a trust for charitable uses. He shows that in the cases where interference was had by the Attorney General, there were trusts delegated to the corporations by act of Parliament, and the intervention of the government was permitted on the ground of threatened breach. I have examined and read all the English cases referred to, and coincide fully with the view taken by Judge Mullin and adopted by the Supreme Court of the State of New York.

The case of the Attorney General vs. The Mayor, etc., of Dublin, in the House of Lords, (1 Bligh, N. R., 312), so much relied upon as being one of the strongest authorities for the maintenance of this suit, was this: An information and bill was filed by the Attorney General on behalf of the inhabitants of Dublin paying water rates, against the corporation, which, stating various acts of mismanagement and misappropriation of the funds arising from the rates, submitting that the corporation were trustees under the act, of rates thereby given, for uses which were *charitable* in their nature; and charging that the conduct of the corporation amounted to a breach of *trust*, prayed among other things a declaration and execution of the *trust*, and that accounts might be taken of the rates received by the corporation, and the application thereof.

To this information and bill, the defendants put in an answer, and among other defenses they submitted that they were not trustees and that the purposes specified in the act were not charitable uses; and the Court held that they had jurisdiction to entertain the information and bill. Here it will be observed that the direct question of trusts and charitable uses was raised, which gave the court jurisdiction.

I have not the time to enter into a review of the English cases, and it would too much extend the length of this opinion, but I think when they are properly looked into they will all be found to be predicated on some act of parliament or have reference to charitable uses or trusts.

The American cases on the subject maintaining the right are unsatisfactory and mostly cases where the point was not raised.

Doolittle, *et al.* vs. Supervisors of Broome county (18 N. Y. 155) was a suit by private individuals to obtain a judgment declaring null and void a certain act of the Board of Supervisors, and it was decided that the suit could not be maintained by persons having no other interest than one common to all the free-holders of the town. That was the real question in the case, and after deciding it, the remark was made that the proceeding of the town, if void, could only be redressed

or prevented at the suit of the State or some officer authorized to act in behalf of the public.

In Roosevelt vs. Draper (23 N. Y. 318,) which was also a suit by a private person, the same doctrine was reiterated. But neither of the cases called for any direct decision upon the subject.

So in the case in Pennsylvania, (The Buck Mountain Coal Company vs. The Lehigh Coal and Navigation Company, 50 Penn. St., 91), the only question decided was that a bill to enforce the performance of public duties by a corporation was not maintainable at the suit of a private party, in the absence of a special right or authority. What was said about the right of the State or the Attorney General to commence and prosecute the suit was mere *dicta*.

The case of the Board of Supervisors vs. Keady, *et al.*, (34 Ill., 293), was in relation to the constitutionality of an act respecting the removal of a county-seat, and the court held it to be unconstitutional. What was said by the judge in reference to the State being a party was wholly outside of the case, and cannot be considered as any authority.

The Massachusetts case (Attorney General vs. City of Salem, 103 Mass., 138), was an information in the nature of a *quo warranto* against the City of Salem, in order to redress certain violations of the Statute, and the court held that the grievance was not remediable upon an information in the nature of a *quo warranto*, or upon a bill of equity filed in the name of the Attorney General.

From the best consideration that I have been able to give to the question, I fail to find any good or sufficient reason for permitting the State to become a party to these suits. I am utterly averse to the adoption of any rule that will allow a State officer to intermeddle in the affairs of every corporation in the State. It will lead to abuse and needless expense on the part of the State. It will impose a duty on the law officers with which neither they nor the States have any legitimate concern. It will have the inevitable effect of relieving persons directly interested in corporations from the duty and responsibility of seeing that abuses are corrected by those immediately interested.

I am not prepared to concur in the opinion that the amendatory act was wholly void. That the legislature possessed the power to amend the original act was fully decided by this court in the case of the State *ex. rel.* Circuit Attorney vs. The Cape Girardeau and State Line Railroad Company, (48 Mo., 468). I am aware that the common law rule was that the title to an act constituted no part of the act. But our present constitution has made an essential and important change in this respect. It is now provided that no law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title; but if any subject embraced in an act be not expressed in the title, such act shall be void only as to so much thereof as is not so expressed. (Const. Mo., Art. IV, § 32.)

Under this clause the title performs an important function. The subject matter of the act must be clearly expressed in the title, and if any subject embraced in the act is not expressed in the title it is void. An act without a title would manifestly be a nullity under this provision of the constitution, and therefore, it follows inevitably, that the title forms and constitutes a part of the act.

This constitutional provision has been before this court several times for determination, and the settled construction is that it was the intention of the framers of that section to prevent the conjoining in the same act of incongruous matters, and of subjects having no legitimate connection or relation to each other. It was not designed to embarrass legislation by requiring a needless multiplication of separate bills, but it was intended that everything contained in any single bill should be germain and have a just and necessary connection. (City of St. Louis vs. Tiefel, 42 Mo., 578; State vs. Mathews, 44 Mo., 523; State vs. The Bank, etc., 45 Mo., 528.)

And it has been held that if the title of an original act is sufficient to embrace the provisions contained in an amendatory act it will be good, and it need not be inquired whether the title of the amendatory act would of itself be sufficient. (Brandon vs. The State, 16 Ind., 197.)

Now the title to the act is "an act to amend 'an act to incorporate the Louisiana and Mississippi River Railroad Company, by increasing the amount of the capital stock of said company, defining more explicitly the power of the Board of Directors to fix the western terminus of said road, etc., etc."

This is a good title, all relating to the same subject matter, and sufficiently refers to the original act to which it is amendatory. Such being the fact, in my judgment the act should be held a valid law.

*Sharp and Broadhead with whom was Thomas J. C. Fagg* on motion for rehearing.

1. The question of most importance, so far as the Railroad Company is concerned, is the validity of the act of 1868, as an amendment to the charter of the company passed in 1859. Upon this point the court as constituted by the selection of a special Judge seems to be divided in such manner as to leave it in doubt as to what is really decided. The special Judge holds the act of 1868 to be wholly illegal and void. Judge Wagner dissents, and Judge Bliss expresses no opinion. It is certainly a grave question, both as it affects the county of Saline and the railroad corporation, leaving both in a state of uncertainty in reference to their respective rights and liabilities.

2. The power of the legislature to amend the charter of a Railroad Company, so as to extend the line of its road, and also to construct branches is conceded by all the members of the court. Now as to the powers, rights, privileges and franchises that will be carried by such amendment there is no expression of opinion except by the special Judge, and it is submitted that upon the idea that the original charter prohibited the company from crossing the Missouri River, this is really the controlling point in importance in the whole case. It is belived that the best interests of the State at large as well as the parties directly affected by the proceeding will be directly subserved by the re-argument and re-consideration of this question. It is claimed that the opinion of the special Judge is in conflict with the decision of this court in State *ex rel.*, Circuit Attor-

ney vs. Cape Girardeau and State Line Railroad, 48 Mo.. 468.

3. The force and effect of the act of March 24th 1868 as a declaratory statute was not presented to the court at all. The object of that statute was to render certain that which was not certain as to the Western terminus of the road as fixed by the act of 1859. In other words, it was a legislative, interpretation of the act of 1859 which did not conflict with any judicial construction of it nor did it affect any vested rights under it. It was not retrospective but operated entirely *in futuro*, and therefore it was competent for the legislature to pass it and thereby fix the route of the road so as to authorize any county on the same side of the river to subscribe to the capital stock.

VORIS, Judge, delivered the opinion of the court on motion for rehearing.

The motion in this case together with the proceedings in the cause have been fully considered.

The motion seems to be mainly predicated upon the disagreement of the Judges of the court who heard the cause upon the validity of the act of 1868, as an amendment to the charter of the Louisiana and Missouri River Railroad Company passed in 1859. In my view of this case, it is not material to the settlement of the main question involved therein, whether said act be valid or not, and this, I think, was the opinion of the Judges who heard the cause; the judgment of the court would be just the same let this question be decided one way or the other. Therefore I think, that it would be unjust to compel the respondents in this case to re-argue the cause in order to settle a question which cannot affect the general result. It may be true that it is important that this question should be settled, and if we were sitting in this case to hear it upon the original trial in this court, we might deem it our duty to pass upon the question suggested; but in my opinion, it would be unjust to the opposite party under such circumstances to compel it to re-hear and re-argue the cause. Judges Adams and Wagner absent.

The other Judges concurring the motion for a rehearing is overruled.