State ex rel. v. Greene County, et al.

STATE OF MISSOURI, *ex rel.*, A. J. BAKER, ATTORNEY GENERAL, Respondent, *vs.* GREENE COUNTY AND GREENE COUNTY COURT, *et al.*, Appellants.

1. *Railroads—Subscriptions to—County bonds—Charter—Subsequent general statutes.*—A provision in the charter of a railroad company, authorizing county courts to subscribe stock to such railroad without a vote of the people, is not repealed by subsequent general laws, nor by the subsequent adoption of the present Constitution. [Smith v. Clark County, *ante*, p. 58.]

2. *Railroads—Counties and municipal bodies, subscription to—Privilege.*—The power conceded to counties or other municipal bodies by a railroad charter, to take and subscribe stock in such railroad, was intended as a privilege to the railroad. [*Idem.*]

3. *Railroads—Consolidation—Effect of.*—When several railroads consolidate, the new road shall stand in their place, and possess the rights, power and privileges they had severally enjoyed in the portions of the road which had previously belonged to them.

4. *Railroads—Bonds, county—Kansas City & Cameron R. R.—Consolidation—Branch road—Act of March 21, 1868.*—The action of the directors of the Kansas City & Cameron R. R., formerly the Kansas City, Galveston & Lake Superior R. R., in determining to build a branch R. R., in accordance with the act of March 21, 1868, and the charter of the Kansas City, Galveston & Lake Superior R. R., and the acts amendatory thereto, followed by the partial building thereof, and followed by their own consolidation with the Han. & St. Joseph R. R., did not deprive such branch road of the privilege of subscriptions from county courts of the counties along the line of the road without a prior vote of the people therein, such privileges being contained in the original charter of the Kansas City, Galveston & Lake Superior R. R.; such branch road was authorized by and was built in conformity to the provisions of the original charter, and, under the act of March 21, 1868, though nominally a branch, was in reality a distinct and separate road from the Hannibal & St. Joseph R. R.

Per VORIES, J., dissenting.

1. *Railroads, subscription to—Counties—Consolidation—Different enterprise.*—A power given to a county to subscribe to a specific R. R. enterprise will not authorize the county to subscribe to the stock of a wholly different company with a different enterprise in view, although the former company may have become consolidated with the latter, or transferred its corporate rights to it, unless such consolidation or transfer was contemplated by the original charter, or was provided for by the general law.

2. *Railroads, subscription to—Charter of Kansas City, G. & L. S. R. R.—Act of March 21st. 1868—Statute, construction of—Branch R. R.—Constitution.*—The act of March 21st, 1868, did not enlarge the power of County Courts to subscribe to the stock of the Kansas City, G. & L. S. R. R. under its charter, and authorize them to subscribe for special stock in the branch road proposed to be built. Besides, such construction would be contrary to the Constitution then in force.

3. *Corporations, municipal—Public improvements, power of subscription to.*—Municipal corporations have no inherent right of legislation, and can only subscribe for stock in public improvements, when such power is given to them by the Legislature, and when the Constitution of the State does not prohibit it.

4. *Corporations, municipal—Bonds—Authority to issue—Innocent holders.*—Municipal corporations having no inherent power to issue bonds, their power to issue bonds is a question of law of which all must take notice at their peril, and there can be no innocent holders without notice of such bonds.

### Appeal from Circuit Court of Greene County.

*Nathan Bray, with whom were Crawford & Cravens,* for Appellants.

I. Under the facts of the case, the County Court of Greene county had power to make the subscription without an affirmative vote of the voters of the county. (1 R. C., 1855, p. 427, § 30; Sess. Acts 1861, p. 60; 22 How., 365.)

II. The act, amendatory of sec. 30 of the act of 1855, passed in 1861, though passed after the act chartering the Kansas City, Galveston and Lake Superior Railroad Company, did not repeal the charter of said company, so far as the right to subscribe stock by a county without a vote first having been had, as was embodied in that charter. Statutes, where they both relate to the same subject matter, must be so construed as to make both effectual, if such a construction can be given them without doing violence to the language of the acts or the manifest intention of the Legislature in passing the laws. A general prohibition to subscribe stock in any corporation may well subsist with a permission to subscribe stock in a particular corporation. (St. Louis vs. Alexander, 23 Mo., 483; State vs. Macon County Court, 41 Mo., 453; Cass v. Dillon, 2 Ohio St., 607; State v. Trustees Union Township, 8 Ohio St., 394; Bacon Abr. "Statute letter D"; Sedg. Com. Law, 123; Dwar. Stat., 532.)

III. This branch road commences and ends at the same places designated for the branch road in the charter of the Kansas City, Galveston and Lake Superior R. R. This right to build this branch road was granted to the old company, and that it transferred that, together with all other rights, to the Kansas City & Cameron R. R. Co., and it by the act of con-

solidation with the Hannibal & St. Joseph R. R. Co. transferred, and the said H. & St. Jo. R. R. Co. became possessed of, the same right under the charter and the act of consolidation, is admitted by the pleadings. So the Hannibal & St. Joseph R. R. Co. stands just where the old company stood, or would now stand had it not transferred its franchises, &c. So appellants in error maintain that the adoption of the. act of March 21st, 1868, by the Board of Directors of the Hannibal & St. Joseph R. R. Co. in nowise affected, altered or changed the power of the county court to subscribe stock to the building of said branch road. The power existed when the subscription was made the same as it did when the act of incorporation of date, Feb 9th, 1857, was passed and by the corporators accepted. That the court then possessed the power to make the subscription without a vote of the tax-payers, is not doubted. If it then had the power, it still has the power. (State vs. Sullivan County, 51 Mo., 522; Smith vs. Clark County, 54 Mo., 58; Grand Chute vs. Winegar, 15 Wall., 385; Nicholay vs. St. Clair County, U. S. Cir. Ct. West. Dist. Mo. [Nov. Term, 1873]; Kenicott vs. Supervisors, 16 Wall., 452; St. Joseph Township vs. Rogers, 16 Wall., 644; R. R. Co. vs. County of Ostoe, 16 Wall., 667; Olcott vs. Supervisors, 16 Wall., 678.)

*Bland & Baker*, for Respondents.

I. The power granted by the charter of 1857 to the County Court, to subscribe for the stock of the corporation, cannot be construed to confer a power to subscribe for special stock—for stock which carries with it a proprietary interest in a part of the property of the corporation, and not in the whole—in the branch line only, and none in the main line. (Marsh vs. Fulton County, 10 Wall., 676; Ranney vs. Baeder, 50 Mo., 600.) No such franchise (to subscribe for stock in a branch line) was vested in the Kansas City, Galveston and Lake Superior Railroad Company under its charter in 1857. How then could such a franchise pass over to the Hannibal & St. Joseph Railroad company by virtue of the consolidation?

II. By the adoption of the act of March 21, 1868, the corpo-

ration elected to proceed in the taking of subscriptions and the building of the branch under the act, instead of proceeding, as it might have done, under its chartered powers, to take the subscription authorized by the charter:—and when the corporation elected to avail itself of the provisions of that statute by filing a resolution to that effect with the Secretary of State, as provided in the first section, and proceeded to take stock in aid of building the branch, then the provisions of the statute took hold of the company in respect to that enterprise, and become, by its express provisions, the governing law of all the proceedings in regard to the building of such branch, and they were of controlling force in interpreting the nature and legal incidents of the subscriptions taken, and of the stock to be issued. The subscription being made under the provisions of the statute of 1868, it was a special subscription as distinguished from a general subscription to the stock of the corporation, in that it controls the application of the fund subscribed to the branch in aid of which it was made ; and in that it entitles the subscriber to special stock limited to the branch line, instead of general stock carrying an interest in the main line and branches ; and this is so by the operation of the statute itself, which determines the kind of stock to be issued.

III. This act of March 21, 1868, under which the subscription was made, could not confer the authority on the County Court to make the subscription without first ordering an election, because it was within the prohibition of the constitution. It must be obvious, therefore, that there was no power whatever in the County Court to make the subscription, issue the bonds and levy the tax in question, and its acts in the premises were clearly without lawful authority, and absolutely void.

WAGNER, Judge, delivered the opinion of the court.

Whether this suit was properly brought, or whether an injunction would lie under the circumstances disclosed in the bill, I will not stop to inquire into, as both parties have expressed

a desire to have the case determined on the merits. The simple question is, whether the County Court of Greene county had the power to make the subscription, that it did in the railroad hereinafter referred to, without first being authorized by the vote of the people? The court below decided against the power, and awarded a perpetual injunction against making any collections for the purpose of paying the county indebtedness in consequence of the subscriptions.

The facts set up in the answer, and admitted by the demurrer, are: That the General Assembly of the State of Missouri incorporated the Kansas City, Galveston & Lake Superior Railroad Company, by an act approved February 9th, 1857; that in pursuance of said act of incorporation, the corporators named in the act duly organized themselves on the 11th day of May, 1857, under the name and style aforesaid; that, by the provisions of the said act, the said railroad company was authorized to construct a branch railroad, commencing at or near the city of Kansas, to any point on the southern boundary of the State, which the directors thereof should select, to connect with any road or roads leading to or in the direction of Memphis, Tennessee, or Napoleon, in the State of Arkansas; and that the County Courts of any county, through which any part of said railroad or its branches may be, or of any county adjoining thereto, were authorized to subscribe to the stock of the said railroad company, and to issue bonds of such county to raise funds to pay the same; and, for the purpose of said act, to appoint an agent to subscribe for stock to said railroad in the name of and on behalf of said county or counties; and that on the 13th day of February, 1864, the legislature, by an act entitled an act to amend an act to incorporate the Kansas City, Galveston & Lake Superior Railroad Company, authorized the Board of Directors thereof to at any time change the name of the said company; and that the board of directors of the company did afterwards in the year 1864 change the name of said company to the Kansas City & Cameron Railroad Company, and that, by the terms and provisions of said last act, the Kansas City and Cameron Rail-

road company acquired, possessed and retained all the rights, privileges and franchises, which existed under and by virtue of the charter of the Kansas City, Galveston & Lake Superior Railroad Company; that by another amendatory act, which was approved March 11th, 1867, it was provided, that it should be competent for the said Kansas City & Cameron Railroad company to consolidate their said railroad company with any other railroad company, on such terms as should be deemed just and proper, and that afterwards in the year 1870 the said Kansas City & Cameron Railroad company did consolidate with the Hannibal & St. Joseph Railroad company, by virtue of which consolidation the Hannibal & St. Joseph Railroad company became the owners of, and possessed of, all the rights, property, privileges, immunities and franchises, which the said Kansas City, Galveston & Lake Superior railroad had and possessed by virtue of its charter and of the said acts of the Legislature amendatory thereto, or which the Kansas City & Cameron Railroad Company had by virtue of the charter of the Kansas City, Galveston & Lake Superior Railroad company, and the amendatory acts to its charter; that on the 3d day of October, 1869, the Kansas City & Cameron Railroad Company, by a resolution adopted by the Board of Directors of said company, at a meeting held in Kansas City in pursuance of its by-laws, resolved, that the Kansas City & Cameron Railroad Company was desirous of availing itself of the provision of the general laws of the State authorizing railroad companies to construct branch railroads, approved March 21st, 1868, and of the provisions of the Kansas City & Galveston R. R. Co. in relation to the construction of a branch railroad as specified in section 13 in said act, approved February 9th, 1857, as also by the acts of the Legislature amendatory thereto; and provided, that the name of the said branch railroad should be the Kansas City & Memphis railroad, and that the same should commence at the city of Kansas, in Jackson county, Missouri, to intersect with the main line thereat; thence to be built through the counties of Jackson and Cass in a generally southern direction to the southern boundary of the State, in the direction of Mem-

35—VOL. LIV.

phis, Tennessee, as prescribed in section 13 of the charter of the Kansas City, Galveston & Lake Superior R. R. Co.; that certain persons, naming them, were appointed a Board of Directors of said Kansas City & Memphis R. R., with full power to take all needful steps to complete their own organization, to procure subscriptions of stock to said railroad, and for that purpose to open books for subscriptions, and to do all other acts which the Kansas City & Cameron R. R. Co. might or could lawfully do in relation to the building, construction and operation of said branch railroad; that a duly certified copy of the proceeding of said Board of Directors of the Kansas City & Cameron R. R. Co. were filed and duly recorded in the office of the Secretary of State.

It is further alleged, that after the said railroad had been built from Kansas City in Jackson county to Cameron in Clinton county, and after the said Kansas City & Cameron R. R. Co. had consolidated with the Han. & St. Jo. R. R. Co., that the latter company, at a meeting of the Board of Directors thereof regularly held, notified, confirmed and approved the resolutions passed by the Board of Directors of the Kansas City & Cameron R. R. Co., and then resolved, that the said Han. & St. Jo. R. R. was desirous of continuing the work already begun on the said branch railroad, and was desirous of availing itself of the laws authorizing the building of branch railroads, and especially the branch railroad known as the Kansas City & Memphis Railroad, and then and there authorized and empowered the Board of Directors of the Kansas City & Memphis R. R. to build said branch, and to aid them in so doing, and to authorize and empower them to do so, vested in and conferred on the Board of Directors of the Kansas City & Memphis R. R. all the powers and rights, which the Han. & St. Jo. R. R. had under the laws aforesaid, and a committee was appointed as an executive, construction and managing committee on behalf of the Han. & St. Jo. R. R. Co. with full power to construct, maintain, manage and operate said branch railroad, and for that purpose to receive subscriptions and do all things needful, which the Han. & St. Jo.

R. R. Co. might lawfully do under the laws of the State, in the construction, maintaining and operating said branch railroad; that a certified copy of the proceedings of the Board of Directors of the Han. & St. Joe. R. R. Co. was filed and duly recorded in the office of the secretary of State on the 5th day of July, 1870; that the committee thus appointed did open books for the subscription of stock to the Han. & St. Joe. R. R. Co., to aid in building and equipping the branch road of the Han. & St. Joe. R. R., known as the Kansas City & Memphis R. R., and that the County Court of Greene county subscribed the stock now in controversy, and appointed a commissioner to make the same. It is also averred, that the bonds of the county for said subscription have been sold to innocent purchasers, and that the road-bed has been graded through the county.

The fact, that the bonds have been negotiated and sold, is a question that need not be considered, as the bond-holders are not before the court, and the only question now is, did the law authorize the county to make the subscriptions?

Essentially the same question as here raised was presented in the case of the State vs. Sullivan County Court, 51 Mo., 522, and it was there held that the power existed. But the matter has again been pressed on the attention of the court, especially with reference to the act of 1868, which, it is contended, is unconstitutional, and, as the act was not particularly mentioned in the above case, it may be deserving of further consideration.

By the thirteenth section of the act to incorporate the Kansas City, Galveston & Lake Superior R. R. Co., (Sess. Acts of 1856-7, p. 166,) it is provided, that " said company shall have full power to construct a branch railroad, commencing at or near the city of Kansas, to any point on the southern boundary of the State, the directors may select, to connect with any road or roads leading to or in the direction of the city of Memphis, in Tennessee, or Napoleon, in the State of Arkansas, and shall be governed in all respects by the provisions of this act in the construction and operation of said branch road."

The fifteenth section declares, "it shall be lawful for the County Court of any county, in which any part of the route of the said railroad or branches may be, or any county adjacent thereto, to subscribe to the stock of the company, or invest its three per cent. fund, or other internal improvement fund belonging to the county, as stock in said road, and, for the stock subscribed in behalf of the county, may issue the bonds of the county to raise the funds to pay the same, and to take proper steps to protect the interest and credit of the County Court; may appoint an agent to represent the county, vote for it, and receive the dividends. Any incorporated city, town or incorporated company, may subscribe to the stock in said railroad company, and appoint an agent to represent its interests, give its votes, and receive its dividends, and may take proper steps to guard and protect the interests of said city, town or corporation."

An act was duly passed and approved February 13th, 1864, amending the charter of the Kansas City, Galveston & Lake Superior R. R. Co., which authorized the said company to change its name (Acts 1863-4, p. 481, § 2); and by an act approved March 11th, 1867, it was enacted, that it should be lawful and competent for the said company to make such arrangements with any other railroad company to furnish equipments and to run and manage its railroad, as it may deem expedient and find necessary, or to lease the same, or to consolidate it with any other company upon such terms as may be deemed just and proper. (Acts 1867, p. 143, § 2.)

The above are all the provisions of law bearing upon the questions presented, up to the passage of the law of March 21, 1868. (Sess. Acts 1868, p. 90-91.)

The first section of this last act provides, that any railroad company in this State authorized by law to build branches, and wishing to avail themselves of the provisions of the act, shall by its Board of Directors pass, and cause to be entered upon its records, a resolution setting forth such desire, and designating the name under which such branch shall be built, its point of intersection with its main line, and general course,

a certified copy of which resolutions shall be filed with the secretary of State, after which they shall be governed by the provisions of the act.

Section two provides, that whenever any such railroad company shall undertake the construction of a branch designated as provided in the first section, they shall receive donations and subscriptions to stock to aid in its construction, in the name of such branch, which shall be expressed in the certificate of stock issued; the cost and expenses of constructing and operating such branch shall be kept separate and distinct from expenses on the said main line.

They may borrow money, and issue bonds secured by mortgage on such branch road, to aid in its construction, and in general may operate, lease, sell or consolidate with any connecting road distinct and separate from their main line; and in any other way may manage or dispose of such branch as by law they may be authorized with reference to their main line, and separate therefrom.

The third section declares, that any branch road so constructed shall not be holden for any debt, lien or liability of the main line, nor shall the main line be holden for any debt, lien or liability of such branch; and that any dividends of profits arising out of the business of such branch road shall be divided among the stockholders in such branch, and in all respects the interest of the stockholders in the branch shall be kept separate and distinct from the interests of the stockholders in the main line.

By section four it is declared, that the holders of stock in any railroad company, which was subscribed in aid of the construction of a branch road according to the provisions of the act, shall have the same rights as other stockholders in the company in the choice of officers; but in all matters directly and specifically affecting the interests of such branch road, the stockholders in such branch shall control; and for such purpose the directors under their by-laws may, or on the petition of parties representing one-tenth of such stock shall, call a meeting of the stockholders in such branch, setting forth the object

of such meeting; and at any such meeting such stockholders may instruct the Board of Directors in all matters relating especially to their interests; and they shall be governed by such instructions, if not inconsistent with the laws of the State and the powers of the company.

The legislative enactments, above cited, show, that the original charter of the Kansas City, Galveston & Lake Superior R. R. Co. gave the power in direct terms to construct the branch road out of which this suit sprang; that it described its beginning point and terminus, namely: at or near Kansas City to the southern boundary of the State, in the direction of Memphis, Tennessee, or Napoleon, in the State of Arkansas. Authority was given to any County Court of any county, through which the branch road ran, to subscribe stock to the company, and to issue its bonds to raise funds for the purposes of construction. It was afterwards authorized to change its name, which it did, and then power was granted to the company to make arrangements with any other railroad company to furnish equipments and run and manage it, or to effect a consolidation.

As the charter was granted, and the power given to subscribe stock without taking a vote of the people, long anterior to the adoption of the present constitution, by a special enactment, the settled law of this State is, that it was not impaired or taken away by any of the subsequent general laws or the constitutional prohibition. This question was recently reviewed in this court, and the cases cited, in Smith vs. Clark County, *ante*, p. 58, and need not be further referred to. The proposition is undoubted, that under the original charter and the amendment thereto, prior to the act of 1868, it was lawful for the County Court to make subscriptions. And if it can be shown, that this proceeding is independent of that act, and does not depend upon it in any manner for its exercise, then I think its validity must be upheld.

If the act of 1868 substantially changes the character of the company, or attempts to confer upon County Courts the power to make subscriptions without first submitting the question

to the qualified voters, then as to such matters I have no hesitation in pronouncing it void. In other words, the act could not organize a new company giving it such power, nor confer any additional power in relation to making subscriptions without the vote of the people where it did not previously exist. It may be said, that the consolidation with the Han. & St. Joe. R. R. Co. merged the existence of the branch in an entirely new company, and therefore it was no longer the company to which the legislature had granted the original powers, and that the company being extinct, the powers were extinguished, and that although the power to take the stock was formerly given, it was a mere privilege delegated to the counties, and was not a franchise which adhered to the company in its new organization.

The difficulty in sustaining this construction is, that the branch road remains still the same as it was before the consolidation took place. And the decisions of this court have been, that the power conceded to the courts or other municipal bodies, to take and subscribe stock in railroads, was intended as a privilege to the corporations. (Smith vs. Clark County, *supra*.)

Now, what was the effect of the consolidations? In the case of Philadelphia & Wilmington R. R. Co. vs. Maryland, (10 How., 376,) it appeared, that the railroad line between Baltimore and Philadelphia, before it was consolidated, originally belonged to several distinct organizations. One of these companies was exempt from certain taxation, and it was claimed by the consolidated company, that this exemption was transferred to it, and affected all parts of the line. The act authorizing the union of the several companies provided, that the said body corporate so formed should be entitled " * * * to all the powers and privileges and advantages then belonging to the former corporations," and the new company claimed the exemption from taxes as one of the privileges and exemptions acquired, but the court held that the exemption did not extend to a portion of the line to which it had not extended before the union. It considered

the evident meaning of the law to be, that, whatever privileges and advantages either of the former companies possessed, should in like manner be held and possessed by the new company to the extent of the road which the said former companies had respectively occupied before the union; that it should stand in their place, and possess the power, rights and privileges they had severally enjoyed in the portions of the road which had previously belonged to them.

The case of Tomlinson vs. Branch, (15 Wall., 460) was a case, where a railroad company by its charter was granted an exemption for a limited period, and was afterwards merged in another railroad company, which became invested with all its property, rights and privileges; the latter company, in which the former was merged, possessed by its charter a perpetual exemption, but it was held, that the charter of the latter company did not extend to the property of the former so as to exempt it.

These cases show what former rights and privileges adhere to companies after consolidation, and they declare the law in conformity with the regulations provided for in the act of 1868.

In the present case none of the property, or the rights and privileges, of the branch railroad, is extended to, or possessed by, the road with which it is consolidated. For all practical purposes it is really and essentially a distinct and independent branch. The union exists simply in name, but not in substance.

An analysis of the act of 1868 abundantly shows this. The 2d section provides, that any railroad company desiring to construct a branch road may receive subscriptions, etc., for the construction of the branch railroad.

The costs and expenses of constructing and operating said branch railroad shall be kept separate from the business of the main line; they may borrow money, lease, sell or consolidate with any other railroad, distinct and separate from the main line. Section 3 provides, that any branch road so constructed shall not be holden for any debt, lien, or liability of the main

line, nor shall the main line be holden for any debt, lien, or liability of the branch; and the 4th section provides, that the stockholders in the branch have the same rights, as stockholders in the main line, in the choice of officers, but in all matters affecting the interests of the branch road the stockholders in the branch road shall control.

The branch road shall control the whole management, and is the only party interested. The Han. & St. Joe. R. R. Co., at the date of the act, was possessed of all the rights, privileges, immunities and franchises granted to the Kansas City, Galveston & Lake Superior R. R. Co. by the act of the 9th of February, 1857. This branch road commences and ends in the same places designated for the branch road in the original charter. It proposes nothing but what was intended to be accomplished by the act creating it, and its union with another company is in name only; no new powers are granted to either the branch or the company with which it is consolidated, and no original powers are taken away.

I see nothing that alters, affects or changes the power of the County Court to subscribe the stock. I think the power existed when the subscription was made, the same as it did when the act of incorporation of 1857 was passed.

In my opinion, therefore, the judgment should be reversed, and the petition dismissed.

Judges Napton and Adams concur; Judge Vories dissents, and Judge Sherwood did not sit.

Dissenting opinion of VORIES, Judge.

I cannot concur in the opinion delivered in this case by the majority of my brother judges, and, owing to the importance of the questions involved, I deem it proper that I should state the grounds of my dissent. In order to a fair understanding of the subject, it will be most convenient for me to re-state the main facts appearing upon the record of the cause.

The action was brought by the State at the relation of the Attorney General to restrain by injunction the collection of a tax levied, and the further levy of any tax within Greene

county, for the purpose of paying either principal or interest on certain bonds issued to the Hannibal and St. Joseph Railroad Company to aid in the construction of what is called the Kansas City and Memphis Railroad. The defendants filed an answer to the petition for the injunction, in which they attempt to set up facts by which it is charged that the legality of the bonds appear. This answer was demurred to, and the demurrer sustained, and final judgment rendered restraining the defendant as prayed for by the plaintiff. From this judgment the defendants appealed to this court.

The allegations of the answer are substantially as follows :

That by an act of the General Assembly of the State of Missouri, approved February 9th 1857, the Kansas City, Galveston and Lake Superior Railroad Company was incorporated ; that the corporators named in the act organized under said act and in said corporate name on the 11th day of May, 1857; that by the provisions of the act the Company was authorized to construct a branch railroad, commencing at or near Kansas City, and from thence to any point on the southern boundary of the State which the directors should select, to connect with any road or roads leading to or in the direction of Memphis, Tennessee, or Napoleon in the State of Arkansas ; and that the County Courts of any county, through which any part of said railroad or its branches may be located, or of any county adjoining thereto, were authorized to subscribe to the stock of said Railroad Company, and issue bonds of such county to raise funds to pay the same ; that on the 13th day of February, 1864, the General Assembly of the State, by an act amendatory of the before mentioned act, authorized said company to at any time change its name, and that the Board of Directors of said Company did afterwards, in the year 1864, change the name of said Company to the Kansas City and Cameron Railroad Company, which last named Company acquired thereby all of the rights, privileges and franchises which existed under the charter of the Kansas City, Galveston and Lake Superior Railroad Company ; that by an act of the General Assembly of the State, approved

March 11th 1867, further to amend the said first named act of
1857, it was provided, that it should be lawful for the said
Kansas City and Cameron Railroad Company to consolidate
its said Company with any other railroad company on such
terms as should be deemed just and proper; and that after-
wards, in the year 1870; the said Kansas City and Cameron
Railroad Company did consolidate with the Hannibal and St.
Joseph Railroad Company, by virtue of which consolidation
the Hannibal and St. Joseph Railroad Company became the
owners of and possessed of all the rights, property, privileges
and immunities which said Kansas City, Galveston and Lake
Superior Railroad Company had by virtue of its charter and
said acts amendatory thereof; that on the 3rd day of Octo-
ber, 1869, the Kansas City and Cameron Railroad Company,
by a resolution adopted by the Board of Directors of said
Company at a meeting held in Kansas City in pursuance of
its by-laws, resolved, that the Kansas City and Cameron Rail-
road Company was desirous of availing itself of the provis-
ions of the general laws of the State authorizing railroad
companies to construct branch railroads, approved March 21st,
1868, and of the provisions of the charter of the Kansas City,
Galveston and Lake Superior Railroad Company in relation
to the construction of a branch railroad as specified in section
13 in said act, approved February 9th, 1857, as also by the
acts amendatory thereof, and provided that the name of said
branch railroad should be the Kansas City and Memphis Rail-
road, and that the same should commence at the city of Kan-
sas in Jackson county, Missouri, to intersect with the main
line thereat; thence to be built through the counties of Jack-
son and Cass in a generally southern direction to the
southern boundary of the State in the direction of Mem-
phis, Tennessee, as prescribed in section 13 of the char-
ter of the Kansas City, Galveston and Lake Superior Rail-
road Company; that certain persons were appointed direc-
tors of said Kansas City and Memphis Railroad with full
powers to take all needful steps to complete their own
organization, to procure subscriptions of stock to said rail-

road, and for that purpose to open books for subscription of stock, and to do all other acts which the Kansas City and Cameron Railroad Company might or could lawfully do in relation to the building and operation of said branch railroad; that a duly certified copy of the proceedings of said Board of Directors of the Kansas City and Cameron Railroad Company was filed and duly recorded in the office of the Secretary of State. The answer of the defendants further states, that, after the Kansas City and Cameron Railroad Company had consolidated with the Hannibal and St. Joseph Railroad Company, the latter Company at a meeting of its Board of Directors regularly held ratified, confirmed and approved the resolutions passed by the Board of Directors of the Kansas City and Cameron Railroad Company, and then resolved that the said Hannibal and St. Joseph Railroad Company was desirous of continuing the work already begun on the said branch railroad, and was desirous of availing itself of the laws authorizing the building of branch railroads and especially the branch railroad known as the Kansas City and Memphis Railroad, and then authorized and empowered the Board of Directors of the Kansas City and Memphis Railroad to build said branch, and, to aid them in so doing and to empower them so to do, vested in and conferred on the Board of Directors of the Kansas City and Memphis Railroad all the powers and rights which the Hannibal and St. Joseph Railroad Company had under the law, and a committee was appointed as an executive construction and managing committee on behalf of the Hannibal and St. Joseph Railroad Company with full power to construct, manage and operate said branch railroad, and for that purpose to receive subscriptions and do all things needful which the Hannibal and St. Joseph Railroad Company might lawfully do under the laws of the State in the construction and use of said branch railroad; that a certified copy of the proceedings of the Board of Directors of the Hannibal and St. Joseph Railroad Company was filed and recorded in the office of the Secretary of State on the 5th day of July, 1870; that the

committee thus appointed did open books for the subscription of stock to the Hannibal and St. Joseph Railroad Company to aid in building and equipping the branch road of the Hannibal and St. Joseph Railroad, known as the Kansas City and Memphis Railroad, and that the County Court of Greene county subscribed the stock and issued the bonds now in controversy to the Hannibal and St. Joseph Railroad Company for the use of said branch road as aforesaid. The answer then avers, that the said bonds so issued have been sold to innocent purchasers, and that the road bed has been graded through Greene county.

The simple question, as I understand it, presented by the record in this case for the consideration of this court is, whether the County Court of Greene county under the circumstances detailed in the answer of the defendants had the power to subscribe the stock subscribed and issue the bonds which were issued and which are brought in question in this suit. For the purpose of considering the points arising, it may be admitted, that by the charter of the Kansas City, Galveston and Lake Superior Railroad Company counties, through which and adjoining which said railroad to be built by said Company and its branches were located, had the power conferred on their several County Courts to subscribe to the capital stock of said Company without having first taken the vote of the qualified voters of such counties, and to issue the bonds of the County in payment for the stock subscribed. And whatever different opinion might be entertained if the question were a new one, it is now also settled by numerous decisions of this court, that the privilege, given to counties to subscribe for stock in railroad companies without any vote of the people by special railroad charters before the adoption of our present constitution, was not repealed by the constitution. In other words, that the provisions of the constitution, prohibiting the Legislature from giving any power to counties to subscribe stock in a Railroad Company without the consent of two-thirds of the qualified voters of the county, &c., only operated on prospective legislation, and did not affect special railroad charters already passed.

These questions have nothing to do with this case, the important question being, whether the privilege granted to counties to subscribe for stock in the Kansas City, Galveston and Lake Superior Railroad Company, or after the change of name of said corporation to the Kansas City and Cameron Railroad Company, would authorize Greene county to subscribe for the stock of the Hannibal and St. Joseph Railroad Company for the use and benefit of the Kansas City and Memphis Railroad, or more properly to subscribe for the stock of the Kansas City and Memphis Railroad Company, which is also called a branch of the Hannibal and St. Joseph Railroad Company, by nominally subscribing to the stock of the last named Company for the use of the supposed branch road?

In the consideration of this question it is not necessary to notice any action of the Kansas City and Cameron Railroad Company in reference to their intention to build a branch road under the act of 1868, for it is not pretended, that that Company has built, or is constructing, a branch road or any other road in which stock has been subscribed; nor is it contended, that Greene county has ever subscribed stock to said Company, either in the name of the Kansas City, Galveston and Lake Superior Railroad Company, or in the name of the Kansas City and Cameron Railroad Company after it assumed that name. What is pretended by the answer of the defendants is, that after the consolidation of the Kansas City and Cameron Railroad Company with the Hannibal and St. Joseph Railroad Company, and said last named Company had become possessed of all of the property, rights, privileges and franchises of the Kansas City and Cameron Railroad Company, the Hannibal and St. Joseph Railroad Company, being desirous to avail itself of the privileges conferred by the act of the Legislature of the State in reference to the construction of branch railroads, approved March 21st, 1868, adopted the proceedings before had on said subject as its own, and proceeded to open books for the subscription of stock to said branch road called the Kansas City and Memphis Railroad,

and otherwise complied with the law on said subject, and filed a certified copy of its proceedings on the subject with the Secretary of State as is required by law.

The proceedings from this on were conducted wholly by and in the name of the Han. & St. Joe. R. R. Co., and it was in this branch road so being constructed by the Han. & St. Joe. R. R. Co. that Greene County subscribed stock, which was nominally subscribed to the Han. & St. Joe. R. R. Co. for the use of said branch road.   By the act of 1868, under which this branch road was being constructed, it is provided by the 1st. section, that " any railroad company in this State, authorized by law to build branches and wishing to avail themselves of the provisions of this act, shall by its Board of Directors pass and cause to be entered upon its records a resolution setting forth such desire and designating the name under which such branch shall be built, its point of intersection with its main line and general course; a certified copy of which resolution shall be filed with the Secretary of State, after which they shall be governed by the provisions of this act." This section, as before stated, the answer charges was complied with by the Han. & St. Joe. R. R. Co., and I suppose it makes no difference in this case, that it is known that the point of intersection named is not within fifty miles of the line of the main road.  By the second section of the act it is provided, that " whenever any such railroad company shall undertake the construction of a branch designated as provided in the first section of this act they shall receive donations or subscriptions to stock to aid in its construction in the name of such branch, which shall be expressed in the certificate of stock issued ; the cost and expenses of constructing and operating such branch shall be kept separate and distinct from expenses on the main line. They may borrow money, and issue bonds secured by mortgage on such branch road, to aid in its construction, and in general may operate, lease, sell or consolidate with any connecting road distinct and separate from their main line, and in any other way may manage or dispose of such branch as by law they may be authorized, with-

out reference to their main line and separate therefrom." It is provided by the third section of said act, that "any branch road so constructed shall not be holden for any debt, lien or liability of the main line, nor shall the main line be holden for any debt, lien or liability of such branch. Any dividends of profits arising out of the business of such branch road shall be divided among the stockholders in said branch, and in all respects the interests of the stockholders in the branch shall be kept separate and distinct from the interest of the stockholders in the main line." The fourth and last section provides, that "the holders of stock in any railroad company which was subscribed in aid of the construction of a branch road according to the provisions of this act, shall have the same rights as other stockholders in the company in the choice of officers; but in all matters directly and specially affecting the interests of such branch road the stockholders in such branch shall control, and for such purpose the directors under the by-laws may, or on the petition of parties representing one-tenth of such stock shall, call a meeting of the stockholders in such branch setting forth the object of such meeting; and at any such meeting such stockholders may instruct the Board of Directors in all matters relating, especially to their interests, and they shall be governed by such instructions if not inconsistent with the laws of the State and the powers of said company.

Now, as before stated, the stock in question, for which the bonds were issued, the collection of which has been enjoined in this suit, was subscribed to the Han. & St. Joe. R. R. Co. for the use of this branch road being constructed by said Han. & St. Joe. Co. under the act of 1868 above set forth. The question is, by what authority the County Court of Greene County has subscribed this stock. It is not pretended, that the county or the County Court had any inherent power to make the subscription; but it is contended, that by the 13th section of the act to incorporate the Kansas City, Galveston & Lake Superior R. R. Co. it is provided, that said company shall have power to construct a branch railroad, commencing

at or near the City of Kansas and from thence to any point on the southern boundary of the State that the Directors may select, etc., and that the fifteenth section of said act makes it lawful for the County Court of any county in which any part of the route of said railroad or branches may be situate, or any county adjacent thereto, to subscribe to the stock of said company, etc., and that said counties might issue bonds without submitting said question to the vote of the qualified voters of the counties as is required by the present Constitution of this State.

This may all be conceded, but the difficulty in the case is not thereby removed, because it is not pretended that Greene County has subscribed to the stock of the Kansas City, Galveston & Lake Superior R. R. Co., or to any branch thereof, or that said company has ever constructed any branch road through or adjacent to Greene County or elsewhere, but, on the contrary, it is stated in the answer of the defendants that by an amendatory act, passed by the General Assembly and approved on the 11th day of March, 1867, it was provided, that it should be competent for the Kansas City & Cameron R. R. Co. (that being the changed name of the Kansas City & Galveston R. R. Co.,) to consolidate their said Railroad Co. with any other railroad company on such terms as should be deemed just and proper, and that afterwards, in the year 1870, the said Kansas City & Cameron R. R. Co. did consolidate with the Han. & St. Joe. R. R. Co., *by virtue of which* consolidation the Han. & St. Joe. R. R. Co. became the owner of, and possessed of, all the rights, property, privileges, immunities *and franchises* which the Kansas City, Galveston & Lake Superior R. R. Co. had by virtue of its charter and the acts amendatory thereof. This is the last that we ever hear of the Kansas City, Galveston & Lake Superior R. R. Co. Its whole existence, property, privileges, rights and franchises under its charter were transferred to, and became possessed by, the Han. & St. Joe. R. R. Co.; it had not, up to that time, constructed a single rod of railroad either of main line or branch road, and of course could do nothing in a corporate

36—VOL. LIV.

capacity after its entire powers and rights were transferred to, and possessed by, the Han. & St. Joe. R. R. Co. It is, however, contended, that, after the consolidation (or what is called the consolidation, for the Kansas City, Galveston & Lake Superior R. R. Co. had no road in fact to consolidate) with the Han. & St. Joe. R. R. Co., the power or privilege to subscribe stock by the counties in or to the capital stock of the Kansas City, Galveston & Lake Superior R. R. Co. was transferred to, and became vested in, the Han. & St. Joe. R. R. Co., and that the County Court of Greene County by virtue of such transfer became invested with power to subscribe to the capital stock of the Han. & St. Joe. R. R. Co., just in the same manner and to the same extent that it had, before the transfer, been authorized to subscribe to the stock of the Kansas City, Galveston & Lake Superior R. R. Co. I cannot assent to this assumption. I do not believe that a power given to a county to subscribe to the stock of a specific railroad enterprise will authorize the county to subscribe to the stock of a wholly different company with a different enterprise in view, with which the former company may have become consolidated, or may have transferred its corporate rights, unless the consolidation or transfer was contemplated by the original charter of the company, or provided for by the general law. In the case under consideration the consolidation was neither provided for by the charter of 1857 nor by the general law ; but the act authorizing the consolidation was not passed until the 11th of March, 1867, more than two years after the adoption of our present Constitution which expressly prohibits the legislature from authorizing any county to subscribe stock to a railroad company without the previous assent of two-thirds of the qualified voters of the county. It may be, that where the stock is subscribed in the original company, and the company afterwards consolidated with another company, that the county would become a stockholder in the consolidated company, but no subscription could be made by the county to the consolidated company under a power to subscribe to one of the companies consolidated. This question is fully discussed,

and the authorities referred to, in a late case decided in the
Supreme Court of the United States, not yet published, but.
to be found in "The Central Law Journal" of March 26th,
1874. In that case, the subscription of stock in question was
held to be valid on the express ground, that it had been con-
tracted before the consolidation, and was made to the original
company, and the consolidation was authorized by the origi-
nal charter, which also authorized the subscription of stock.
But that question, although I think it is conclusive, need not
be discussed or relied on in this case, as it is not pretended
that Greene County has in any legal or rational sense sub-
scribed to the stock of the Han. & St. Joe. R. R. Co. Greene
County, by the subscription of stock in question, has not ob-
tained a particle of interest in the capital stock of either the
Han. & St. Joe. R. R. Co., or the Kansas City, Galveston &
Lake Superior R. R. Co., nor has either of said railroad com-
panies acquired the least amount of beneficial interest either
in the stock subscribed by Greene County or in the road to
be constructed therewith. But, on the contrary, the stock
subscribed by Greene County is subscribed for the use of an
independent organization of stockholders for the purpose of
constructing an independent road called a branch road, and
known as the Kansas City & Memphis R. R., which is being
constructed under the act of 1868 before quoted. It cannot
be pretended, that this branch road is being constructed by
either the Kansas City, Galveston & Lake Superior R. R.
Co. under its charter, or by the Han. & St. Joe. R. R. Co.
under the same charter; but the record shows, that the road
is being constructed, and the stock subscribed, under the pro-
visions of the act of 1868 before quoted, and that act provides,
that, after its provisions are accepted, the branch road must
be constructed under and be governed by its provisions; hence
we must necessarily look to its provisions to find the power,
if there be any power, in Greene County to subscribe the
stock in question. When we refer to the provisions of that
act, as they have been hereinbefore quoted, it will be seen,
that a branch road constructed under its provisions is just as

much an independent road and organization as if it was constructed under an independent charter for the construction of a road in a totally different part of the State. The corporation to which the county was authorized to subscribe stock, and the association of stockholders constructing this branch, are radically and fundamentally different in reference to their objects and the ends for which they were created. The only connection between this road called a "branch" and the main line is, that the directors of the Hannibal road are made the agents of the stockholders of the branch road for the purpose of enabling them to construct their road without having a separate act of incorporation, and thus to transact their business through the directors of the Hannibal & St. Joe. R. R. Co.; but still these directors, it will be seen by the last section of the act, are under the ultimate control of the stockholders of the branch road so far as its interests are concerned. The main or original corporation has no interest in the branch road, and is not responsible for its debts, and cannot be made to bear any of its burdens. And the branch road and its stockholders have no interest in the main line or original corporation either as stockholders or otherwise, and are not responsible for its acts or liabilities. It therefore seems to me to be clear, that the provisions of the charter of the Kansas City, Galveston & Lake Superior R. R. Co., authorizing counties to subscribe for the capital stock of that company, could not be tortured into an authority to take stock in this independent and wholly dissimilar organization, with which it has no connection or interest, and that it makes no difference that the original charter of the Kansas City, Galveston & Lake Superior R. R. Co. authorized it to construct a branch thereof through the same county where this independent road is to be located. If the subscription of stock had been made under the original charter and to the original company, the county of Greene would have acquired an interest in the capital stock of both the main line and all the branches constructed under its charter, which is a very different thing from the interest of a stockholder in this branch road to be constructed under the act of 1868.

State ex rel. v. Greene County, et al.

This case is infinitely stronger than that of Marsh vs. Fulton County, 10 Wallace, 676. In that case a subscription was authorized, by a vote of the people of Fulton County, to the stock of the Mississippi and Wabash Railroad Company, and under such authority the supervisors ordered the clerk to make the subscription. After the vote giving the authority, and before the subscription was made, the legislature of the State of Illinois changed the character of the company, separated the road into three divisions, authorizing the stockholders in each division to elect separate Boards of Directors for the management of their own division. After this action of the Legislature, the clerk made the subscription to the central division, that being the division of the road passing through Fulton County. The court decided, that this was a different enterprise from the one to whose stock the Board of Supervisors, under the authority of the election, had ordered the Clerk to subscribe, and that the subscription so made and the bonds issued in payment thereof were absolutely void, and this in the hands of a purchaser for value.

As before stated, the case under consideration is a much stronger case than that, and yet this court in the case of The State to the use of Neal vs. Saline County (48 Mo., 390) refers to and fully approves the decision in the case of Marsh vs. Fulton County, the learned Judge, delivering the opinion of the court, using this language: "The opinion is a clear one and contradicts in effect the *dicta* of the judges in several of the other cases, and places the validity of county bonds upon satisfactory grounds. * * * * * It was a case where the people had authorized a subscription to the capital stock of one company, and no authority whatever was given to subscribe to that of another—an absence of authority and not an irregularity in granting it." In a later case, decided by this court, the case of Marsh vs. Fulton County was again brought under review, and was fully and unreservedly approved. Judge Wagner, in delivering the opinion of the court in that case, uses this language: "The people authorized the subscription to be made to the capital stock of one company, and the clerk made the

subscription to the stock of another company. This he had no power to do." (Ranney vs. Baeder, 50 Mo., 600.)

It will be observed in the case of Marsh vs. Fulton County, before referred to, and which is so fully approved by this court on two different occasions, the route of the road was not changed, the road remained the same, but the corporation was divided into three Boards of Directors, each having control of different parts of the road, and Fulton County, by the subscription of stock made, only acquired an interest in one division. The principle in that case and the one under consideration are identical; but the present case is much stronger and more marked in its facts. It seems to me, that after the decisions of this court just referred to, in which the case of Marsh vs. Fulton County was so fully approved, there ought to have been no doubt entertained in reference to the present case. At least it is clear to my mind, both from the authorities referred to and upon principle, that the subscription of stock made by Greene County, and the bonds issued in payment thereof, were made and issued without authority and are wholly void. It is, however, claimed by the counsel for the defendants, that the statute of 1868, before set out in this opinion, is an enabling and amendatory act, and that as such it took up the power to subscribe for general stock, as conferred by the charter of the Kansas City, Galveston and Lake Superior Railroad Company, and imported it into said act of 1868, by which the power to subscribe for general stock in said last named railroad company was enlarged and extended into a special power to subscribe for special stock in the branch road proposed to be constructed under the provisions of the act of 1868. I do not think that the act of 1868 admits of any such construction; but if it be so construed, it is clear that said act would be in palpable violation of the provisions of the Constitution in force at the time, by which the general assembly is prohibited from passing any law to confer power on a county to subscribe for stock in a railroad company without the previous sanction of at least two-thirds of the qualified voters of such county. The subscription under consideration,

not having been submitted to the voters of that county for their assent, was, therefore, made without authority of law and in violation of the Constitution of the State, and is, for that reason, void.

It is also stated in the answer of the defendants, that the bonds issued by the County Court of Greene County, the collection of which is sought to be enjoined by this action, have been sold to innocent purchasers, who now hold the same. It is said by a majority of the court in the opinion delivered in this case, that the fact, that the bonds have been negotiated and sold, need not be considered as the bondholders were not before the court. It may be true, and is true, that, with the view taken in the opinion delivered in the case, it was not requisite, after it had been held that the bonds were issued by authority of law and were valid bonds, to further inquire into the question of their negotiability. But if, as I think, the bonds were issued without authority and were, therefore, void, then, if it were possible that such void bonds could be made binding obligations in the hands of what are called innocent purchasers, I cannot see why the defendants might not set up such fact as a defense to an action brought to enjoin the county officials from collecting taxes to pay the bonds or interest thereon, which, upon such assumption, the county would be bound to pay. There could, in such case, be no necessity for the presence of the bondholders; the answer charges, that the bonds have passed into the hands of innocent purchasers, which fact, if material, is admitted by the demurrer. The question then to be considered is, whether, in the nature of things and the meaning of the law, there can be such a thing as an innocent purchaser or holder of a bond issued or made by the County Court of a county without any authority of law, or when a county bond, which is void when issued for the want of any power in the county to issue the same, can be validated and turned into a valid obligation by a transfer of the same to what is called an innocent purchaser? It seems to me, that if this question were a new one, and had not been mystified and brought into doubt by the decisions of some of the

respectable courts of the country, there could be no difficulty in its solution. It is, I think, conceded by all, and has so been held by the courts,that a county or other municipal corporation has no inherent right of legislation, and cannot subscribe for stock in any public improvement, unless authority is given to it so to do by the legislature, and where such legislation is not restrained by the Constitution of the State; that such municipalities can only act in such cases by legally delegated authority. (Thomson vs. Lee County, 3 Wall., 327.) By the 14th section of the 11th article of our Constitution, adopted in the year 1865, it is provided, that "the General Assembly shall not authorize any county, city, or town to become a stockholder in, or to loan its credit to, any company, association or corporation, unless two-thirds of the qualified voters of such county, city or town, at a regular or special election to be held therein, shall assent thereto."

I think that I have before succeeded in showing, that the bonds made by Greene county were made in aid of an association of stockholders, who were to construct a branch railroad under the act of 1868, in which no incorporated railroad company had any interest, except as the directors of the Hannibal & St. Joseph Railroad Company were made the agents of said association for the convenient transaction of the business of said association, and it is not pretended that any vote of the qualified voters of Greene County was ever taken by which they could assent to the subscription of the stock or the issuing of the bonds in question. Now as every person is bound to take notice of the Constitution of the State and the law of the land, how is it possible that there could be an innocent purchaser of these bonds within the meaning of the law in reference to innocent purchasers without notice? We are not without authority on this subject, and, for the purpose of making myself understood on the subject, I will refer to a few of the leading cases, and will quote from the language of some of the able judges, who delivered the opinions,which present the question more clearly than I could by any language of my own.

In the case of Marsh vs. Fulton County (10 Wall., 676), before referred to to illustrate other points in the case, the learned Judge, in delivering the opinion of the court, in discussing the exact point now under consideration uses the following clear and conclusive language: "A subscription to a company, whose charter provides for a continuous line of railroad of two hundred and thirty miles across the entire State, was voted by the electors of Fulton County, not a subscription to a company whose line of road was less than sixty miles in ex tent and which, disconnected with the other portions of the original line, would be of comparatively little value. But it is earnestly contended, that the plaintiff was an innocent purchaser of the bonds without notice of their invalidity. If such were the fact, we do not see how it could affect the liability of the county of Fulton. This is not a case where the party executing the instrument possessed a general capacity to contract, and where the instruments might, for such reason, be taken without special inquiry into their validity. It is a case, where the power to contract never existed—where the instrument, with equal authority, might have been issued by any other citizen of the county. It was a case, too, where the holder was bound to look to the action of the officers of the county, and ascertain whether the law had been so far followed by them as to justify the issuance of the bonds. The authority to contract must exist before any protection as an innocent purchaser can be claimed. This is the law, even as affects commercial paper alleged to have been issued under delegated authority."

This same doctrine is upheld in the case of the Supervisors, of Fulton county vs. The Mississippi and Wabash Railroad Company, (21 Ill., 338).

It will be seen, that the decisions in these cases turned entirely on the question of power. The doctrine, and the reason of the cases, is, that, where the power exists in the party or corporation to issue the bonds, and they are accordingly issued and pass into circulation and into the bonds of innocent purchasers for value, such holder can recover, notwithstanding

any mere irregularity in the issuing of the bonds or any defect in the consideration thereof. But in cases of municipal corporations having no inherent power to issue bonds, and none has been delegated to them to do so, that then all persons, who purchase such securities, do so at their peril and are not protected as innocent purchasers. Such purchasers are bound to know the law, and see that the power has been delegated, and that the law delegating the power has been substantially complied with. Innocent purchasers are protected on the ground, that there is some defect or infirmity in the paper purchased of which they had no notice. If they have notice of the defect, they are not protected. This reason can never apply where the defect consists in a want of power in a corporation to do the act or execute the instrument. Such defects do not consist in matters of fact of which a party must have notice, but in matters of law of which all must take notice at their peril. It is like a question of jurisdiction, which can always and under all circumstances be insisted on.

The same question involved in this case was fully and ably considered in the case of The Floyd acceptances (7 Wall., 666.) There the acceptances consisted of drafts drawn by Russell, Majors and Waddell on account of their contract with the Government for supplies for the army. The drafts were drawn in advance, or in anticipation of the supplies to be furnished, and made payable to the order of the drawers, and accepted by Floyd, Secretary of War. They were afterwards indorsed for value by the payees. It was contended, that the Secretary of War had a right to issue the acceptances in payment of indebtedness by the Government, and that it was the custom of the officers of the Government to pay off demands against the Government in that way, and that, when such drafts were transferred in the usual course of trade to innocent purchasers for value, in such hands the consideration could not be inquired into. The case was elaborately considered and examined by the Supreme Court of the United States, and in an able opinion delivered by Justice Miller,

after conceding that the instruments were negotiable in form, he proceeded to say: "In the case of such paper issued by an individual, when we make ourselves sure of his signature we are sure that he is bound, because the right to make such paper belongs to all men. But the Government is an abstract entity, which has no hand to write, or mouth to speak, and has no signature which can be recognized as in the case of an _ndividual. It speaks and acts only through agents or more properly officers. These are many, and have various and divers powers confided to them. An individual may, instead of signing with his own hand the notes and bills which he issues or accepts, appoint an agent to do these things for him. And his appointment may be a general power to draw or accept in all cases as fully as the principal could, or it may be a limited authority to draw or accept under given circumstances defined in the instrument which confers the power. But in each case the person dealing with the agent, knowing that he acts only by delegated power, must at his peril see that the power on which he relies comes within the power under which the agent acts, and this applies to every person who takes the paper afterwards, for it is to be kept in mind that the protection, which commercial usages throw around negotiable paper, cannot be used to establish the authority by which it was originally issued. These principles are well established in regard to the transactions of individuals. They are equally applicable to those of the Government. Whenever negotiable paper is found in the market, purporting to bind the Government, it must necessarily be by the signature of an officer of the Government, and the purchaser of such paper, whether the first holder or another, must at his peril see that the officer had authority to bind the Government."

The foregoing reasoning of Judge Miller, which, I think, is incontrovertibly the law, is in all its force and bearing applicable to the bonds issued by a County Court under the Constitution and laws of this State. The county like the Government is an abstract entity, having neither hands to write, nor mouth to speak, and has no signature that can be

recognized. It speaks and acts only through agents, and can only act by or through delegated authority, and can issue no bonds unless it is authorized by the constitution and laws of the State to do so. Every person being bound to take notice of the law, each person who deals with the county through the County Court, knowing that it acts only by delegated authority, must at his peril see that the paper purchased, and on which he relies, comes within the terms of the power delegated, and this whether he is the original holder or a subsequent purchaser. "The protection thrown around commercial paper" cannot be used to establish the authority by which it is issued. It must be borne in mind, that in cases of the kind here referred to the paper is not declared bad by virtue of any extrinsic fact affecting the consideration or fairness of the transaction, but it grows out of a want of power to execute the bond, or to make the contract, by the agency employed, and hence it seems to me to be irrational to talk about an innocent purchaser without notice. Everybody is bound to take notice of the law, and the law, as I think, is and always has been, that as to such agencies, where it is known that they can only act by delegated authority, everybody dealing in paper purporting to have been executed by them must at his peril see that the power has been delegated and substantially complied with. (Sto. Agency, § 307a.)

I might refer to a number of analogous cases, where the same principle involved in the case before referred to was fully discussed and uniformly settled in the same way. In the case of The Schooner Freeman vs. Buckingham (18 How., 182;) the question was as to the validity of certain bills of lading issued by the master of the vessel as against the owners. The bills had been signed and issued by the master for goods which were really not on board the vessel. Judge Curtis, in delivering the opinion of the court, states the law as follows:

"If the signer of a bill of lading was not the master of the vessel, no one would suppose the vessel bound, and the reason is because the bill is signed by one not in privity with the

owner. But the same reason applies to a signature made by a master out of the course of his employment. The taker assumes the risk, not only of the genuineness of the signature and of the fact that the signer was master of the vessel, but also of the apparent authority of the master to issue the bill of lading. We say the apparent authority, because any secret instructions by the owner, inconsistent with the authority with which the master appears to be clothed, would not affect third persons. But the master of a vessel has no more apparent unlimited authority to sign bills of lading than he has to sign bills of sale of the ship. He has an apparent authority, if the ship be a general one, to sign bills of lading for cargo actually shipped, and he has also authority to sign bills of sale of the ship when in case of disaster his power of sale arises. But an authority in each case arises out of, and depends upon, a particular state of facts. It is not an unlimited authority in the one case more than in the other, and his act in either case does not bind the owner even in favor of an innocent purchaser, if the facts on which his power depends did not exist, and it is incumbent upon those, who are about to change their condition upon the faith of his authority, to ascertain the existence of all the facts upon which his authority depends."

This case is referred to, quoted from, and fully approved in the late case decided by this court of the Louisiana National Bank vs. Laveille (52 Mo., 380), in which case it was held, that a bill of lading, issued by a general agent of a vessel for said purpose, but for goods not on board the vessel, was void as to the owner even in the hands of an innocent purchaser for value, although the bill itself recited the fact that the goods were on board the vessel. Numerous other cases might be cited, both in this country and in England, to the same effect. The ground, upon which all of these decisions are based, is, that the particular circumstances did not exist which were necessary to the lawful exercise of the power by the agency attempting to do the act.

I know that there have been a number of recent decisions

made by the Supreme Court of the United States, in which the court has, with an apparent desire to uphold railroad bonds and bonds issued in the aid of other public improvements (in what seems to me to be a disregard of all of the well settled law governing such agencies in other cases), held, where bonds are issued by a County Court, which county has under any circumstances the authority to issue bonds, and it is recited in the bonds (no matter how false or fraudulent the recital may be) that the circumstances exist necessary to the exercise of the power, that such bonds will be valid, and the false recitals cannot be disputed when the bonds are in the hands of what the court denominates an innocent purchaser. In other words, that a purchaser may blindly rely on these false recitals in the bond, and, if he does so, the recitals cannot be disputed as to such purchaser. It is to be observed, that the bonds issued by Greene County now in question had no recitals in them not stated in the defendants' answer, and, if they had, it could make no difference in the case.

It is not difficult to see, that such decisions entirely defeat and dissipate the provisions of our Constitution. The Constitution provides, that neither the Legislature nor the county courts of the different counties, nor both combined, shall have power to subscribe to the stock of railroads or other public corporations on the part of the counties, or issue bonds therefor, or otherwise loan the credit of the counties for such purposes. And yet, if we are to take these decisions as law in this State, the judges of county courts may defy the Constitution of the State, subscribe to the stock of railroad companies at pleasure, issue the bonds of the county in payment of the stock subscribed without the assent of the qualified voters required by the Constitution, and transfer the bonds so issued, without authority and in defiance of the constitution, by merely reciting a falsehood in the body of the bond. If this can be done, I ask of what avail is it for the people of a State to attempt to guard their rights by constitutional restrictions? It is, however, worthy of remark, that the most if not all of these recent decisions were made by a divided court, and have never been

recognized as law by the court of last resort in this State since the adoption of our present Constitution. The decisions of this court, made since the adoption of our present Constitution, wherever this question has come under consideration, I believe, have been uniform in holding, where bonds were issued by county courts without a substantial compliance with the law, or in violation of the prohibitions of the Constitution, that such bonds are void, no matter in whose hands they may be found.

The first case in this court, where the question involved was discussed since the adoption of our present Constitution, is the case of Steines vs. Franklin County (48 Mo., 167). In that case all of the authorities on the subject were carefully reviewed, after which it was held by the court, that bonds issued without a vote of the people, where it is required by law, are void in whose hands soever they may be found, and that it is a question of power which must be conferred by a vote of the people, and, like a question of jurisdiction, can always be relied on under all circumstances. The case of Flagg vs. Palmyra was commented on and disapproved.

The next case involving the same question, which came before this court, is the case of the State vs. The Saline County Court (48 Mo., 390.) In that case the case of Marsh vs. Fulton County, 10 Wall. hereinbefore referred to, is commented on and fully approved. The next case, where the question was considered, is the case of the State vs. The Saline County Court (51 Mo., 350), where it is held, that, since the adoption of the new Constitution, no bonds can be authorized without the vote of the people, and, if issued without such authority, they are void. The next case coming before this court is the case of Carpenter vs. The Town of Lathrop (51 Mo., 483), where the subject was again fully discussed, after which it was held by a full court, that the vote of the people must be obtained at an election authorized by law, or that no power was conferred on the town authorities to issue the bonds, and that bonds, issued without a substantial compliance with the Constitution and law, would be absolutely void, and that the recitals in the bonds were not conclusive on any one.

The only remaining case, in which the question involved in this case came under consideration, is the case of Smith vs. Clark County (*ante* p. 58.) In that case the learned Judge, delivering the opinion of the court, did, in his opinion, discuss the recent decisions of the Supreme Court of the United States, in which it is held that the recitals in a county bond are conclusive on the inhabitants of the county where the bonds were in the hands of innocent purchasers, and gave those decisions his approval. But the case itself was decided on a different point, and that point was not necessarily involved in the decision of the case, and, in an explanatory opinion filed by Judge Adams upon a motion for a re-hearing, the doctrine that the recitals of the bonds were conclusive was repudiated in the following explicit language: " It was not necessary to decide, that the recitals in the bonds issued by the County Court to the railroad company were conclusive or amounted to an estoppel. In my judgment and in the judgment of a majority of the court, they do not amount to an estoppel. Although that is the settled doctrine of the Supreme Court of the United States, it has not been sanctioned here so as to make it a rule of decision in this State." In this explanatory opinion of Judge Adams the majority of the judges of this court concurred. So that it will be seen, that this court has, ever since the adoption of our present Constitution, constantly repudiated the idea, that the false recitals in a bond, purporting to have been issued by a county court, would conclude the county or the tax-payers from denying such recitals. And, may I not ask, in either reason or justice, should our decisions have been otherwise?

The people of this State have notified the whole world by the provisions of their Constitution, that they will not be responsible for the payment of bonds issued by the County Court of a county, or otherwise on behalf of a county, unless the previous assent of the qualified voters of the county shall have been obtained in the manner pointed out in the Constitution. Persons who purchase such securities are bound to take notice of this constitutional provision. But men can be found, who,

when they find such securities on the market, in place of informing themselves as to whether authority has been conferred upon the agency, by which the bond purports to have been executed, to execute the same, voluntarily elect to recklessly rely upon false recitals in the bond, which recitals, as well as the bond, are made by one who had no authority to make them. Who in such case is the innocent party, the purchaser of the bond, or the tax-payer who is asked to pay it? I know of no rule of either law or ethics, which would require one to say that it is not the tax-payer. I apprehend, that the assumption that the purchaser of a bond under such circumstances is an innocent purchaser of the bond within the meaning of the law, and the county or tax-payers thereof estopped from denying the recitals of the bonds, though falsely made, is not only opposed to the well-settled law on the subject of such agencies, as well as against the reason of the case, but, when the question shall be impartially examined, it will be found that such an assumption is as void of justice as it is deficient in reason.

In my opinion, the judgment of the Circuit Court ought to have been affirmed.